HARRINGTON *v.* INTERSTATE BUSINESS MEN'S ACCIDENT ASSOCIATION.

1. EVIDENCE—CERTIFIED COPY OF DEATH CERTIFICATE PRIMA FACIE EVIDENCE.

Under 2 Comp. Laws 1915, § 5607, a certified copy of a death certificate on file with the health department of the secretary of State is made *prima facie* evidence in all courts and for all purposes of the facts recorded therein.[1]

2. SAME—PROOFS OF DEATH—ADMISSIONS—CAUSE OF DEATH.

Proofs of death of an insured are competent evidence of the facts therein stated, being in their nature admissions, but are not conclusive and may be varied or contradicted in case of an honest mistake, where the issue is the cause of death.[2]

3. SAME—PRIMA FACIE CASE NOT OVERCOME BY NEGATIVE TESTIMONY.

The testimony of a physician, who was called to attend the insured at the time his body was taken from a burning building, that he could not state the cause of death, is but negative testimony and does not have probative force to overcome the positive affirmative proof of the cause of death shown by an official record made in compliance with statutory requirements, based on a medical certificate and coroner's inquest held shortly after the fire to determine in what manner and by what means deceased came to his death.[3]

4. INSURANCE — ACCIDENT INSURANCE — CAUSE OF DEATH — PRIMA FACIE CASE—DIRECTED VERDICT.

Where, in an action on an accident policy, insurer's *prima facie* case that the cause of insured's death was suffocation, which limited its liability, was not met by any competent contradictory evidence, insurer's motion for a directed verdict should have been granted.[4]

Error to Houghton; Stone (John G.), J.   Sub-

[1]Evidence, 22 C. J. § 922; [2]Accident Insurance, 1 C. J. § 194; Evidence, 22 C. J. §§ 344, 502; Insurance, 33 C. J. § 666; Life Insurance, 37 C. J. § 316; [3]Accident Insurance, 1 C. J. § 334 (Anno); [4]Id., 1 C. J. § 336.

On liability of insurance company for death of insured from asphyxiation, see notes in 30 L. R. A. 121; 2 L. R. A. (N. S.) 168; L. R. A. 1917D, 740.

On conclusiveness of proof as to cause of death against beneficiary, see note in 44 L. R. A. 853.

mitted January 6, 1925.     (Docket No. 4.)     Decided October 1, 1925.

Assumpsit by Daniel C. Harrington, administrator of the estate of John C. Vogel, deceased, against the Interstate Business Men's Accident Association on a policy of insurance.     Judgment for plaintiff.     Defendant brings error.     Reversed.

*Galbraith & McCormack,* for appellant.

*Rees, Robinson & Petermann,* for appellee.

STEERE, J.     On May 8, 1917, plaintiff's decedent, John C. Vogel, lost his life in a fire which partially consumed a moving picture theatre known as the Crown Theatre, located in the village of Red Jacket, Houghton county, Michigan, of which he was owner and manager.     He held an accident insurance policy issued to him by defendant under the terms of which a maximum death loss of $5,000 was provided with certain conditions and limitations, that involved here being:

"The insurance provided for loss by accidental means shall not exceed:     *     *     *     (2) Five Hundred Dollars ($500) if the loss be caused by (*a*)     *     *     * (*b*) Asphyxiation by any kind of gas:"     *     *     *

Plaintiff as Vogel's administrator presented to defendant proof of death loss claiming the full sum of $5,000 named in the policy, which defendant declined to pay, contending that Vogel's death was caused by asphyxiation by gas and offered to pay the sum of $500 as provided in the policy for death so occasioned. Plaintiff refused to accept tender of that amount and brought suit on the policy.     Defendant pleaded issuably in denial of the amount claimed, but admitted a liability of $500 and offered to pay that amount. Reversal in defendant's favor of a previous judg-

ment in this case will be found in 210 Mich. 327.    A
new trial was granted for the reason that the trial
court had erroneously excluded evidence offered by
defendant to show deceased's death resulted from
asphyxiation by gas.    On the trial the facts were
mostly stipulated and the evidence practically undis-
puted except that relating to the cause of death.

The theatre was in a brick building about 98 feet
long and 22 feet wide with a flat roof composed of
wood covered by a ·composition of tar and felt.    The
stage was at the west end and the operating rooms at
the east end of the building.    There was a bed-room
12 or 15 feet square on the same floor and level with
the operating rooms, located about 78 feet from the
stage on the south side of the east end of the build-
ing, partitioned off with pine or hemlock ceiling and
unplastered.    Vogel was sleeping in this room when
the fire broke out.    It started at about 6 p. m. in
the dressing room under the stage near the south-
west corner, burnt the stage drop and set curtains,
wings and other things in that end, went up the
wall and burnt through the roof and along it to the
east.    In its course it burned a small hole through
the ceiling of the bed-room in which Vogel was sleep-
ing, but otherwise there was no fire in that room al-
though the products of combustion invaded it through
the door, transom, ceiling, etc., filling it to such extent
that Vogel apparently perished from their effects.

Before the case came on for trial the parties stipu-
lated as to procedure:

"That if the defendant, either as a matter of law
or by verdict of the jury, fails to establish its affirma-
tive defense upon which it reserves the right to intro-
duce testimony, the judgment of the court shall be
in favor of the plaintiff in the sum of five thousand
dollars ($5,000), with interest and costs, but that if
the defendant shall establish its affirmative defense
of breach of warranty, and the court shall hold, as a
matter of law, that the facts established constitute a

legal defense, then and in that event the judgment shall be in favor of the defendant, with the costs to be taxed, but if the defendant shall fail to establish its special defense of breach of warranty, or if, having established the facts, the court shall hold, as a matter of law, that the same does not constitute a complete defense, and the defendant shall further establish that the death of plaintiff's decedent was within the limitation set up and alleged as a further special defense, then and in that event, the court shall enter judgment in favor of the plaintiff for the sum of five hundred dollars ($500), with interest; the costs to be determined according to the state of the pleadings."

When the case was called and the jury sworn defendant's counsel admitted in open court as true every fact alleged in plaintiff's declaration necessary to prove to entitle him to recover, stated that defendant relied solely on its affirmative defense under the second subdivision of the conditions in the policy for reduction of the loss to $500 and suggested that under Circuit Court Rule No. 42 defendant had the right to open and close the case. This was conceded and the court in explanation of the situation said to the jury:

"To put it in plain language, this insurance policy * * * contains a clause that if in case of loss by asphyxiation by any kind of gas, the recovery can only be $500, and the defense takes upon itself the affirmative proof that death was caused by asphyxiation by gas or gases, and will take the opening and closing, that is the only issue, practically, in the case. * * * If the defense fails to bring itself within the limitation, then the recovery would be under the other clause of the policy."

Defendant's counsel then made his opening statement to the jury and proceeded with the defense. At the close of the evidence both parties moved for a directed verdict. The court announced the motions would be held for consideration under the Empson Act and submitted the case to the jury, which rendered a verdict in favor of plaintiff for the maximum amount

of the policy with interest.   The court thereafter heard defendant's motion for a judgment *non obstante,* which was denied and followed by a motion for a new trial because the verdict was against the great weight of the evidence, which was also denied.   Defendant brings the case to this court on numerous assignments of error.

To establish its contention defendant introduced documentary evidence of the cause of death, consisting of plaintiff's proofs of loss served upon it containing his own statement under oath that deceased was found dead in a burning building and the cause of his death was "suffocation," an affidavit of the chief of the fire department saying that he found deceased lying on the floor near his bed and "the room was filled with smoke and gas," that he pulled him about five feet toward the window and then "had to rush for the open door to escape from death myself," the attending physician's statement under oath giving the cause of death as "suffocation from smoke" and his unsuccessful professional treatment "artificial respiration and oxygen, pulmotor," a sworn statement of a "disinterested friend or neighbor" that the cause of death was "suffocated," and a verified copy of the coroner's certificate that the coroner's jury found deceased "met his death by suffocation."   Also the record of death in the clerk's office of Calumet township giving the cause as "suffocated by smoke and gas," and a certified copy of death certificate on file with the State health department showing the cause of deceased's death was "suffocated by smoke and gas on May 8, 1917."   This was followed by testimony of witnesses as to certain circumstances of the fire, and expert testimony relative to asphyxiation, as applied to the circumstances shown.

Defendant's oral proofs showed that the fire was discovered by two men who were working on a picture

projector in the operating room near the east end of the building, a short distance from the room in which deceased was sleeping, when they saw smoke coming through the walls into the room where they were. One of them at once went out to turn in the fire alarm. The other, named Franquist, testified that he looked but could not see down to the stage or any flames, for it was all smoke and he could not see very far. He went to wake Vogel up. When he went in there was no smoke in the room. He shook Vogel and told him the place was on fire. Vogel looked up with a brief interrogatory response but did not get up. Witness went out leaving the door open, and left the building by the front way as he could not get out at the rear because there was too much smoke, which he described as a dark gray, heavy, biting smoke which made him cough, and he left because he could not stay any longer.

Jacob Kaiser, the fire chief, who stated in his affidavit on proof of loss that after pulling deceased toward the window he had to rush for the open door to escape from death himself, testified that they received the fire alarm about 6 o'clock and he went out in the first rig. They got two lines of water on the fire before he learned Vogel was in the building, which he thought was some 10 or 15 minutes after they received the alarm. He first tried to enter the building by the front way but could not do so, then put a ladder up to a window at the rear, broke through it and went in with his helmet on, he could not see for the smoke but found his way to the room where they told him Vogel's bed was and by feeling found him on the floor near the bed about 10 or 12 feet from the window. He tried to and did move him a short distance but he was a large, heavy man weighing over 200 pounds, and he ran back to the window to get a little air. A fireman named Schenk came up and

they got him to the window.    Others helped carry
the body down the ladder.    He described the smoke
as a "heavy, black smoke," said he could not have gone
into the room without a gas helmet on nor remain
very long with it on because there was too much heat,
which was the only thing that drove him out.    He
could feel it burning his back through his rubber coat
which was burned "so it was no good after."

Schenk, the fireman who assisted the chief to get
the body to the window, testified that when he first
got into the building the chief was standing on the
cornice outside, "came out for fresh air," he also went
in with a gas helmet on, the smoke was so thick he
could not see Vogel's body if he stood up but by
kneeling down and crawling along the floor he could
just about see it, they dragged him out along the floor,
the smoke was pouring out of the broken window all
the time they were at work and that it was pretty
hot in the room so that they could not stay there very
long.

Defendant introduced expert testimony by physicians
that "suffocation" and "asphyxiation" have the same
meaning and are interchangeable terms, both resulting
from lack of a necessary supply of oxygen, with
definitions from standard dictionaries of smoke, gas,
suffocation and asphyxiation, in harmony with their
testimony.    Defendant's principal expert witness was
Dr. Bourland, a physician and surgeon of many years'
experience, who before graduation in medicine gradu-
ated as a bachelor in chemistry and had practical
experience as a commercial chemist for some time.
He testified that combustion of the curtains, wood-
work and other material shown to have been burned
would result principally in carbon dioxide, carbon
monoxide and water in suspense mixed with unburned
particles of carbon with some other minute particles
from the paint and mixed coloring in the articles

burned, the main constituent being carbon dioxide and carbon monoxide and water; the dark color of smoke being the minute particles of unburned carbon which is the visible part of smoke, the gases being invisible; that asphyxiation and suffocation are "interchangeable words" meaning the "same thing," which is the result of exclusion from the lungs of the necessary supply of oxygen, whether by gases, which destroy or exclude it, or by mechanical methods such as choking, pressure on the wind-pipe, etc., to exclusion from the lungs of the necessary amount of oxygen to maintain life, drowning being one of the grosser forms of suffocation caused by its immediately flooding the lungs and totally shutting off the supply of oxygen.

He further explained in detail on direct and cross-examination the chemical action of gases from combustion in excluding or destroying the supply of pure oxygen, and particularly of carbon monoxide in uniting with the red hemoglobin of the blood, causing in a person suffocation "just as truly as if he were in an atmosphere where he had no oxygen at all;" that carbon monoxide is a poison gas which produces a chemical change in the blood and death when one is overcome by it is death by asphyxiation, though also called death by poison. In answer to a hypothetical question describing from the testimony the condition of the room at the time Vogel's body was carried from it and for a short time before as "exceedingly hot and so densely filled with this smoke you could not see through it," he stated he would say "this room was filled with a suffocating gas."

The only witness called by plaintiff was Dr. Rupprecht, "the attending physician," who had made a statement under oath that the cause of death was suffocation from smoke. He testified that deceased had formerly been one of his patients and when the fire occurred he was sent for. When he got near the

fire they were just bringing deceased's body down from the building over a ladder and putting it in a vehicle, he ordered him sent to the hospital and went right there himself to attend him, performed artificial respiration and used a pulmotor for about two hours with negative results; that he found no marks, or anything on the body to indicate in what manner deceased came to his death; said he had listened to some of the testimony given at the trial in regard to smoke at the fire, and on a hypothetical question embracing the essential facts shown was asked: "Can you state what was the cause of his death?" to which he replied, "I cannot." Following this reply in his direct-examination both parties then rested.

The certified copy of the death certificate on file with the health department of the secretary of State is made by statute *"prima facie* evidence in all courts and for all purposes of the facts recorded therein." 2 Comp. Laws 1915, § 5607. The cause of decedent's death recorded therein is: "Suffocated by smoke and gas." Supplementing and elaborating this official proof defendant introduced in evidence plaintiff's proofs of loss verified by his oath and accompanied by the various official certificates and affidavits required. These proofs of death were competent evidence of the facts therein stated, being in their nature admissions, but not conclusive and may be varied or contradicted in case of an honest mistake. *John Hancock Mut. Life Ins. Co.* v. *Dick,* 117 Mich. 518 (44 L. R. A. 846) ; *Krapp* v. *Insurance Co.,* 143 Mich. 369 (114 Am. St. Rep. 651) ; *Haapa* v. *Insurance Co.,* 150 Mich. 467 (16 L. R. A. [N. S.] 1165, 121 Am. St. Rep. 627). Although not conclusive they are *prima facie* evidence of the facts stated in an action on a life insurance policy where the issue is the cause of death. *Hanna* v. *Insurance Co.,* 150 N. Y. 526 (44 N. E. 1099).

The controlling question involved here is whether

there was any issue of fact raised by the testimony under which it might be left for the jury to find that the *prima facie* case of defendant was overcome by other evidence.     It is contended for plaintiff that there was evidence carrying the case to the jury in the testimony of its witness Dr. Rupprecht that he could not say what was the cause of death, and the testimony of defendant's witnesses as to excessive heat and smoke in the room from which deceased was carried out.     Pursuant to that theory the trial court said in submitting the case to the jury:

"You will remember the testimony of Jacob Kaiser, the fire chief, and William Schenk, the fireman, who were in the room, and as I stated, there was smoke in the room and to have smoke you have in suspension in the gases solid matter, generally carbon, and if you should find that the proximate, effective cause of death was heat or the inhalation into the lungs of the solid matter in the smoke which, too, might suffocate one, then your verdict will be for the plaintiff, in the sum of $5,000, with interest."

Against the *prima facie* case made by defendant, none of the affiants in support of the proofs of loss gave any testimony in explanation or contradiction of his sworn statement as to the cause of death, and no witness testified that the cause of death was not as the proofs of loss and official record shows.

Shortly after the accident when the facts were fresh Dr. Rupprecht made oath as attending physician that "the precise nature and extent of the injury" at the time he first visited deceased was, "Suffocated, dead when removed from bed," and that his treatment of him was an effort to restore respiration.     Later when called as a witness by plaintiff he did not say that his sworn certificate was untrue or that he was then laboring under any misapprehension, but without any explanation when asked if he could state what was the cause of death, simply replied, "I cannot."     Such

an answer is in its nature but negative testimony and does not have probative force to overcome the positive affirmative proof of the cause of death shown by an official record made in compliance with statutory requirements, based on a medical certificate and coroner's inquest held shortly after the fire to determine "in what manner and by what means" deceased came to his death.

Neither are we able to find in this record any substantial evidential support for the theory that deceased was killed by heat or smothered by minute particles of carbon suspended in the smoke.   There were no indications on his body that such was the case.   The fire did not reach the room where he was found, except to burn a small hole in the ceiling at the southeast corner, and nothing in the room was burned. When Franquist notified him of the fire, or tried to, he did not get up before Franquist left the room, going out of the building by the front entrance because as he stated he could not get out by the rear exit and "couldn't stand it any longer."   When the fire chief later learned Vogel was in the building he could not get in by the front entrance because of the progress of the fire, and he finally got a ladder up to a window and entered the building through it.   He said he could not have gone into the room where he found Vogel without his helmet, which he described as fitting over the head like a hood and tight around the neck with an air tank slung at the back, and the reason he could not remain there very long was because of the heat.   Asked how long he remained when he first went in and was trying to take Vogel out he said "about three or four minutes."   Both he and the fireman who helped him were able to go in after that with their helmets on and to stand the heat until they found and carried or dragged Vogel out, who was a large, heavy man weighing over 200 pounds.   As to heat only, no reason

is shown¹ why Vogel could not have gotten out when it became unbearable as well as they could.   The fact that the fire chief could not go into the room without his helmet on to furnish him breatheable air suggests the real reason why Vogel did not get out.

We are constrained to hold that the *prima facie* case, made by the official death certificate and admissions of cause of death in the proofs of loss, has not been met by any competent contradictory evidence under which a jury could legally ignore it.   Defendant's motion for a directed verdict should have been granted.   Pursuant to the stipulation quoted a judgment must be entered "in favor of the plaintiff for the sum of five hundred dollars ($500), with interest."

The judgment heretofore entered is reversed, with costs of this court to defendant, and the case remanded for further proceedings in harmony with this opinion.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.