## SARAH F. LAURY v. NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY.[1]

No. 27,779.

April 25, 1930.

[1]Reported in 230 N. W. 648, 231 N. W. 824.

*William J. Archer, John G. Williams* and *Norman L. Baker,* for appellant.

*Jenswold, Jenswold & Dahle,* for respondent.

HOLT, J.

There was a recovery upon a life insurance policy, and defendant appeals from the order denying its motion in the alternative for judgment or a new trial.

The defense was false statements knowingly and intentionally made by the insured in the application for insurance. Defendant alleged that the insured, David N. Laury, died in an epileptic attack, and that to his knowledge he was subject to such attacks and had suffered a near fatal one within five years prior to the application for insurance while in the swimming tank of the high school in Virginia, Minnesota, his home. The application was made April

24, 1926, and of the numerous questions contained therein to which the insured agreed to give truthful answers the defendant particularly sets forth the following to have been false upon which the defense is predicated, viz:

"10.  Q.  Give below all illnesses, diseases or accidents you have had during the past five years, with the name of physicians or attendants.  If none, so state."  The answer was "None."

The next question was:

"Are you now in good health?  If not, give particulars."  The answer was "Yes," and further that he had never been confined to his home by illness, that his usual medical attendant or family physician was Dr. W. M. Empie.

Also this:

"12.  Have you had since childhood any of the following diseases or symptoms?  Give below full particulars, including number of attacks, date, duration and result of each.  Each question must be read and answered 'No' or 'No, except' in regard to such diseases or illnesses which you may have had."

Then follow subheads from "A" to "I", with no more room than a space of two and one-half inches in length and less than a quarter of an inch in width to answer each subhead.  The subhead here involved is:

"B.  Q.  Dizzy spells, Unconsciousness, Fits, Epilepsy, Apoplexy, Paralysis, Mental Derangement, or any disease of the Brain or Nervous System?"  The answer was "No."

The chief incident relied on to show the falsity of the answer to the last quoted question occurred February 6, 1922, a little more than four years prior to the time the application for insurance was made.  The insured was then a student at the Virginia public schools.  He was an athlete, being on the swimming, basket ball, and football teams or squads, and a winner in some contest.  His appearance is described as robust and healthy.  On the date mentioned he was seen about to dive into the deep part of the tank, and

someone noticing him under the water in an unnatural position for a diver gave the alarm and he was pulled out unconscious. The instructor in charge of the swimming squad employed the usual methods to resuscitate those drowned. Consciousness returned in a few minutes, and he was taken home but returned to school the same day or the next. There is evidence that he experienced some disturbance during athletic exercises at a previous time, but no description thereof is given.

Defendant also introduced the deposition of Dr. Empie (apparently the physician employed by the school board) that previous to the episode in the tank and during a period of four or five years he had been called to the home of the insured some four or five times to see the young lad. This was early in the mornings. He at those times complained of headaches and indisposition in general and appeared "possibly slightly stupid," but the doctor could find no organic trouble whatever. He gave him a physical examination at these times and testified to a question asked by defendant regarding convulsions that he "never was able to find any evidence he had had convulsions."

After the incident in the swimming tank the school authorities denied David its use. But within a few weeks he and his mother, this plaintiff, prevailed on them again to extend all athletic privileges to him. The record is absolutely silent as to any subsequent occurrence suggestive of any epileptic symptom.

Within less than a year after the policy issued the insured was found one morning dead in bed. Three months afterwards an autopsy was had, but the body was then frozen solid and had been affected by embalming fluids so that those who made it testified that from the autopsy alone no opinion could be formed as to the cause of death. The same doctor who put the questions and wrote down the answers in the insured's application for the policy signed the physician's certificate in the proofs of death furnished by plaintiff. In this certificate, after stating that the insured without any previous illness was found dead in bed, he gave the cause of death and particulars as follows: "He apparently had an epileptiform

attack during sleep and suffocated." He also stated that the insured "is said to have had epileptiform attacks previously" and that "relatives state that he had had epileptic attacks in sleep previously." There is no evidence that plaintiff had so said or that she had seen this certificate of the doctor, though it is attached to and made part of the proofs of death furnished by her and wherein she agrees that the certificate of the doctor is submitted in connection with her claim as a part of the proofs of death. As a witness however she denied that she ever knew the insured to have had dizzy spells, fits, or epileptic attacks.

Defendant insists that it was entitled to judgment. It had the burden of proof. It undertook to prove that the insured had made a material misrepresentation when he stated that he was in good health and had had epilepsy in no form. If defendant established as a matter of law that the insured had been or was subject to epileptic attacks, it would be entitled to judgment even though he was ignorant of his affliction and hence innocently represented that he was free therefrom, for unquestionably epilepsy or fits must be held to increase the risk of loss. "If a material misrepresentation increases the risk of loss the policy is avoided, regardless of the intent with which it was made." Johnson v. Nat. Life Ins. Co. 123 Minn. 453, 456, 144 N. W. 218, 219, Ann. Cas. 1915A, 458, and the authorities there cited. The latest case so holding, with additional authorities, in this court is Iblings v. Phoenix Mut. L. Ins. Co. 172 Minn. 341, 215 N. W. 429. We think the question whether the insured suffered from some form of epilepsy when he applied for insurance was for the jury and not the court. The same applies as to the cause of death.

We do not overlook the testimony of the mother that she took her son to a specialist in Minneapolis because she deemed the advice of a good doctor was needed; that Dr. Empie, the school physician, apparently of good professional standing, had been called previously; that the son had had some disturbance during some athletic practice and subsequently was near death in the swimming pool. But Dr. Empie, who had had the best opportunity of the medical

experts to ascertain the insured's health, including the so-called accident in the swimming pool, testified that he was unable to discover any organic trouble or epileptic manifestations, though he inquired both of plaintiff and David as to symptoms thereof. This was on occasions when a jury could well conclude that both mother and son would be anxious to tell the doctor the truth.

We have gone quite far enough when we hold that an insurance policy can be avoided for a misrepresentation in respect of being free from a disease which increases the risk of loss even though the insured was ignorant of its existence in his body and made the misrepresentation innocently. We should not, in answers to complicated and equivocal questions, seek the misrepresentation which as a matter of law increases the risk. For instance, it may be held as a matter of law that an affliction known as epilepsy increases the risk, but the same should not be held in respect to a single incident of unconsciousness. Over 50 specific diseases and ailments are mentioned in the questionnaire the applicant was to answer, and occasionally is thrown in the phrase "or any diseases" of a particular system of the anatomy, ending up with: "Have you had any other illness, disease or injury not mentioned above?" It is to be remembered that applicants for insurance are not all doctors. They do not all differentiate between symptom and disease. From question 12 and the many subheads thereunder it is left in doubt whether information concerning the existence of symptoms or diseases was sought.

Nor can it be said as a matter of law that there was a material misrepresentation in the answer to the tenth question above quoted. It does not appear that Dr. Empie's last call at the home of David was within the five-year period covered by the question. The swimming pool incident came within that period, but if that was the result of an attack of cramps or some temporary functional disturbance of a mere passing consequence it could hardly come under the name of accident. Dr. Empie was the only doctor then present, and it is not clear that the resuscitation was not accomplished before he arrived; at least David was then breathing, and the doctor

simply continued the resuscitating movements the swimming instructor employed before he came. No other treatment was given or prescribed nor consultation had.

It does appear that in November previous to this incident plaintiff took David to Dr. Hamilton in Minneapolis for advice or diagnosis. There is no evidence of treatment. There is evidence that he came three times to the doctor's office. It does not appear that David then suffered from any illness, disease or accident for which Dr. Hamilton treated or attended. The question is not directed to whether or not a specialist or doctor has been called on for advice or has been consulted, unless in connection with some illness, disease or accident. Nor can it be said that the answer to question 10, in failing to state that Dr. Hamilton's advice had been sought, was a misrepresentation as a matter of law of a material fact increasing the risk. The case of Travelers Ins. Co. v. Pomerantz, 246 N. Y. 63, 158 N. E. 21, cited by defendant, deals with a false statement by the applicant: "I am not deformed; I have no bodily or mental disease, nor have I received medical or surgical attention within the past five years," when the uncontradicted proof showed the applicant during that period had received medical attention no less than 12 times from five physicians. Had the applicant in the instant case made a statement that he had consulted no physician or surgeon within five years a different question would have been presented, and more like the one which controlled in the case cited.

Defendant introduced the proofs of death made upon its blanks, consisting of a double sheet and containing the sworn statements or answers to questions from plaintiff, the undertaker, an acquaintance, and the attending physician. The physician gave the immediate cause of death thus: "He apparently had an epileptiform attack during sleep and suffocated." The physician stated: "Is said to have had epileptiform attacks previously," in answer to this question: "Had deceased any other disease, acute or chronic, or had he ever had any injury, infirmity or surgical operation?" He also answered: "Yes. Relatives state that he had had epileptic

attacks in sleep previously," to the question: "Did the deceased have any hereditary predisposition to the disease from which he died? If so, please state the particulars."

In respect to these last two answers, around which the attorneys drew a pencil line before the document was given the jury, the court gave this instruction, upon which error is assigned:

"Among the other exhibits that will go with you to the jury room will be defendant's exhibit 1 [proofs of death] and you will find on the page marked D of that exhibit two questions and answers which were received, the answers being received in this case for only a special purpose, and that purpose was not as evidence of the facts therein recited. And as to those two, which counsel has marked with the lead pencil,—and you will have no difficulty in distinguishing those from the others—as to those two you will not take any statement that may be within those lines inclosing the answers to those two questions as being evidence of the fact therein recited. You understand what I mean; not evidence of the fact. If it says that it was from a certain cause or so on, it is not to be taken as evidence of that fact. It was received for another purpose and not for that purpose."

Both attorneys deemed the explanation sufficient in form, but defendant's attorney excepted. This presents the serious question for review.

The law is well settled that proofs of death are admissible in an action to recover on the policy and may be used as admissions against the plaintiff, the beneficiary, even though the statements therein contained did not come to the plaintiff's knowledge. The statements therein found are not conclusive, they may be explained and even contradicted, but are admissible for what they may be worth in view of the other testimony. Bentz v. N. W. Aid Assn. 40 Minn. 202, 41 N. W. 1037, 2 L. R. A. 784; Johnson v. Nat. Life Ins. Co. 123 Minn. 453, 144 N. W. 218, Ann. Cas. 1915A, 458; Melton v. Royal Highlanders, 194 Iowa, 352, 189 N. W. 787; Harrington v. Interstate B. M. A. Assn. 232 Mich. 101, 205 N. W. 116; Stephens v. Met. Life Ins. Co. 190 Mo. App. 673, 176 S. W. 253; Hanna v. Con-

necticut Mut. L. Ins. Co. 150 N. Y. 526, 44 N. E. 1099; Hill v. Aetna L. Ins. Co. 150 N. C. 1, 63 S. E. 124; Krogh v. Modern Brotherhood, 153 Wis. 397, 141 N. W. 276, 45 L.R.A.(N.S.) 404; Mutual L. Ins. Co. v. Newton, 89 U. S. 32, 22 L. ed. 793; Home Benefit Assn. v. Sargent, 142 U. S. 691, 12 S. Ct. 332, 35 L. ed. 1160. 17 A. L. R. 366, contains a very full citation of authorities on the subject. But in so far as those cases go it does not appear that the precise question here involved was presented. Both answers concerning which the court instructed the jury were pure hearsay, and the last answer was not a proper response to the question asked. Although an attending physician's statements in the proofs of death, presented by the beneficiary in an insurance policy, may be used as admissions against interest, still, when such statements on their face show that they are pure hearsay and the evidence discloses that the beneficiary neither knew of the hearsay part nor authorized anyone to report the hearsay to the physician, the insurer should not be heard to claim them to be evidence tending to establish as facts that which some unauthorized party told the attending physician. These cases furnish some authority that those parts of a physician's statement in proofs of death which purport to be hearsay are not to be taken as proof of the fact stated therein; Gilchrist v. Mystic Workers, 188 Mich. 466, 154 N. W. 575, Ann. Cas. 1918C, 757; Neudeck v. Grand Lodge, 61 Mo. App. 97; Insurance Co. v. Schmidt, 40 Ohio St. 112; Commonwealth B. & C. Co. v. Hendricks (Tex. Civ. App.) 168 S. W. 1007.

The conclusion arrived at in regard to the hearsay statements of the attending physician in the proofs of death also determines that the court correctly excluded questions put to the physician as to what plaintiff's son and son-in-law told him as to the hearsay statement when they asked him to fill in the proofs of death. There was no proof or offer of proof that they had been authorized by plaintiff to give such information in her behalf. And she on the witness stand had testified positively that she never knew of any sort of fits, convulsions or epileptiform attacks of David in his sleep or otherwise, and he lived with her all his life.

The deposition of Dr. Hamilton, the specialist to whom plaintiff took David in November, 1921, was introduced. The doctor refused to answer questions as to communications made between plaintiff or David and the doctor at those interviews on the ground that they were privileged communications. The doctor was not present at the trial, and hence the court had no occasion to rule on the admissibility of the unanswered questions, and there is nothing here to review on that ground. But in passing we may say that the permission the insured gave in the application for physicians whom he had consulted to disclose facts to defendant should be construed to mean to disclose them if defendant sought to obtain such information prior to and as a basis upon which to accept the application and issue the policy.

Many errors are assigned upon the charge. The court might well have excluded more of plaintiff's multitudinous requests to charge than was done, particularly the part covered by the 21st assignment of error, for it does not seem applicable to any evidence introduced. However it is not perceived that any prejudice could result therefrom. It is true that the charge attacked by the 19th assignment does not go as far in defendant's behalf as Johnson v. Nat. Life Ins. Co. 123 Minn. 453, 144 N. W. 218, Ann. Cas. 1915A, 458, warrants. But defendant preferred no request for a more favorable instruction, and the one given was to render a verdict for defendant if certain facts were found and was based upon the defense set forth in the answer that the insured knowingly and fraudulently with intent to deceive made the alleged misrepresentations. Defendant preferred only one request to charge, and that was not predicated on the holding in Johnson v. Nat. Life Ins. Co. 123 Minn. 453, 144 N. W. 218, Ann. Cas. 1915A, 458, nor is the refusal to give it assigned as error. In line with Mack v. Pacific Mut. L. Ins. Co. 167 Minn. 53, 57, 208 N. W. 410, 412, the court instructed the jury that the questions in the application did "not require the disclosure of ailments of a trivial, temporary or unimportant nature, but only those of a serious, dangerous or permanent character." The jury could find that the indisposition for which Dr. Empie had been

called, as well as the swimming tank incident, were of the former sort and not the manifestation of epilepsy in any form.

While some parts of the testimony of plaintiff do not give the impression of being candid or sincere, it was for the jury to weigh it and ascertain and accept what was true. We are not able to discover any substantial error in the trial which would justify us in disturbing the verdict.

The order is affirmed.

### UPON REARGUMENT.

On July 18, 1930, the following opinion was filed:

HOLT, J.

A reargument was granted upon two questions:

"(a) Did the court err when charging that the jury should not consider the recitals in the proofs of death from the attending physician of what others had related to him as evidence of the facts told?

"(b) Did the court err in excluding statements made by relatives of the insured, other than plaintiff, to the attending physician, when requesting him to furnish proof of death regarding symptoms of epilepsy manifested by the insured previous to the issuance of the policy?"

The answers depend upon the situation of the case when the trial court was called to act. Defendant admitted the issuance of the policy, the death, and receipt of due proofs of death, but denied liability upon the alleged ground of fraudulent misrepresentations made by the insured in his application for the policy. This placed the burden of proof upon defendant; and it undertook to prove that the insured had epilepsy when the policy issued and died from suffocation during an epileptic attack, by first calling plaintiff for cross-examination so as to lay a foundation for the introduction of the proofs of death, wherein were hearsay recitals that the insured had previously suffered from epileptic attacks. Her testimony disclosed that while she as beneficiary had signed the proofs of death,

she had not asked Dr. Pearsall as attending physician to make the statement which was a part thereof, had authorized no one to relate anything to the doctor concerning the health of the insured or the cause of death, had never seen the statement, and knew nothing of its contents. She further testified that to her knowledge the insured never exhibited any symptoms of epilepsy, that he always had been at home and slept with either a younger or an older brother. Thereupon the proofs of death were offered by defendant as admissions by plaintiff of the facts therein contained.

Plaintiff's attorney objected to these two recitals in Dr. Pearsall's statement with respect to the death of the insured:

"Is said to have had epileptic attacks previously," and

"Yes. Relatives state that he had epileptic attacks in sleep previously,"
for the reason that they were hearsay and not evidence of the fact that he had had them. The court received the proofs of death, including the hearsay recitals of the doctor, but remarked:

"I do not think it is admissible for all purposes. There are statements in there clearly not within his [Dr. Pearsall's] knowledge. I do not think they ought to be received as proof of the facts."

Defendant's attorney responded:

"Well, that will present itself possibly a little later, and I think we would like to call the court's attention to some things in regard to that in the shape of proof."

Proof was presented as defendant saw fit bearing upon the alleged misrepresentations of the insured, his consultation with Dr. Hamilton, the swimming pool incident, his state of health, the circumstances of his death, the autopsy, and the opinions of the medical experts as to the cause of death. In rebuttal plaintiff called Dr. Arnold, her son-in-law, who had taken the proofs of death to Dr. Pearsall for his statement. Dr. Arnold testified he had had no knowledge that the insured was other than in good health, but admitted that the insured had had some trouble with his teachers in school and had consulted Dr. Hamilton. Dr. Arnold did not claim to have had any authority to speak for plaintiff or

to relate to Dr. Pearsall what anyone had said concerning the condition of the insured's health.

With the record in this shape we are convinced that the trial court did not err when charging the jury that the hearsay recitals of Dr. Pearsall above quoted should not be considered as proof of the existence of the facts related. As stated in the opinion, the authorities are in harmony that the proofs of death furnished by the beneficiary pursuant to the conditions of an insurance policy may be offered in evidence by the insurer in an action on the policy as an admission against the beneficiary of the existence of facts therein stated. But in most jurisdictions it is now equally well settled that the beneficiary is not concluded by such statements. It may be shown that they were not true or that they were made under misapprehension and hence not to be considered as admissions. If that be so, it should logically follow that when it is shown that the beneficiary had not procured the hearsay statement, had not authorized anyone to procure it, had not seen it, and had had no knowledge of the existence of any of the facts so stated, such recitals should not be considered as admissions by the beneficiary or as prima facie proof of the existence of the facts related. It may be conceded that the attending physician's statement of the cause of death need not be based on his own observation. It may rest in part on the history of the case as learned from the deceased or others. But what he has been told by others, even if contained in his statement, should not be used as admissions against the beneficiary when clearly shown to have been inserted without the knowledge of the beneficiary and delivered to the insurer without having been seen by the beneficiary; nor should such hearsay so inserted without the knowledge or approval of the beneficiary be considered as proof of the existence of that which was related.

In this case, with the report of Dr. Pearsall in its hands and plaintiff's denial in the reply of the misrepresentation as to health, no relative or other person was called by defendant to prove any previous epileptic or epileptiform attacks, unless the swimming

pool incident was such a one. If a brother of the insured accompanied Dr. Arnold when Dr. Pearsall's statement was procured, defendant did not call him as a witness nor offer to show that he was the one who told Dr. Pearsall of previous epileptic attacks. Plaintiff did call Dr. Arnold in rebuttal, and that gave defendant full opportunity to bring before the jury the discussion of the case between the two doctors, and the introduction in evidence of a written opinion of Dr. Arnold about that time given to Dr. Pearsall wherein, among other causes of death, Dr. Arnold stated it might be due to an epileptiform seizure, or Jacksonian epilepsy, but which was eliminated as a cause of death by the disclosure of the autopsy performed several months thereafter. The circumstances herein above referred to indicate rather clearly, it seems to us, that on no theory should the hearsay recitals be considered by the jury as admissions by plaintiff that the insured had had previous attacks of epilepsy, nor should such recitals be taken as prima facie proof that he had suffered such attacks.

As we read the new cases cited by appellant in its brief on the rehearing, they are not opposed to the result we reach. Where a statute makes a coroner's certificate prima facie evidence of certain facts it is properly receivable. Bromberg v. North Am. L. Ins. Co. 192 Mich. 143, 145, 158 N. W. 141, 142. In that case, it is true, the certificate was not obtained by the beneficiary but by his son, who sent it to the insurer as part of the proofs of death. Apparently the answer there did not admit due proofs of death, for the opinion says:

"It [coroner's certificate] was a part of the proofs of death forwarded to the defendant in pursuance of the terms of the contract, and the beneficiary relied upon it to satisfy a condition precedent to bringing suit."

It is also to be noted that the certificate did not contain hearsay recitals. The deputy coroner called to view the insured certified the cause of death was "a gunshot wound in the head, self-inflicted while temporarily insane." Jensen v. Continental L. Ins. Co. (C. C. A.) 28 F. (2d) 545, is also where a certificate was by statute

prima facie evidence. Gits v. New York L. Ins. Co. (C. C. A.) 32 F. (2d) 7, was a decision in favor of plaintiff, even though newspaper clippings accompanying the proof of death were considered admissible. In Cotton States L. Ins. Co. v. Crozier, 216 Ala. 537, 113 So. 615; National L. & A. Ins. Co. v. Puckett, 217 Ala. 110, 115 So. 12, the statements of the attending physicians were upon their own knowledge and did not contain hearsay recitals. Dickey v. Supreme Tribe Ben Hur, 218 Mo. App. 281, 269 S. W. 633, is where the beneficiary stated in the proof of death that the insured committed suicide, and so far as that decision goes it favors this respondent. Rudolph v. John Hancock M. L. Ins. Co. 251 N. Y. 208, 167 N. E. 223, was not a case of hearsay recitals, and moreover the beneficiary there had heard the certificate read and had presented it as part of the proofs of death. Leonard v. John Hancock M. L. Ins. Co. 76 Misc. 529, 135 N. Y. S. 564, is not in point, for the beneficiary knew what the certificate contained when it was presented to the insurer, and the contents were not hearsay. Cirrincioni v. Metropolitan L. Ins. Co. 223 App. Div. 461, 228 N. Y. S. 354, was not a case involving hearsay recitals, and the policy itself contained provisions that the proofs of death could be used against the beneficiary.

As to the second question reargued, we are of opinion that the record does not show any error in the rulings of the court. Dr. Pearsall was called by defendant and was permitted to testify that when called to resuscitate the insured he was aided in forming an opinion as to the cause of death by what was told him, but when asked what Dr. Raihala, who had also arrived, and a brother of the insured, said, objection was made as calling for hearsay and sustained, it appearing that plaintiff was not present. The other occasion when Dr. Pearsall had any talk with a relative concerning the insured was when Dr. Arnold obtained the statement of Dr. Pearsall as attending physician; and after the witness was permitted to state that he and Dr. Arnold discussed the personal history of the deceased as an aid to the giving of an opinion and filling out the certificate, the objection was sustained to the ques-

tion: "What did he tell you?" The court said there was no evidence that plaintiff had sent him to give information. The ruling was right. Moreover, Dr. Arnold afterwards took the stand for plaintiff and was cross-examined at length and his written opinion as to the cause of death was received in evidence; but no foundation was laid for any impeachment of his testimony, nor was any effort made to show that he told Dr. Pearsall any different story from what he told in court.

Whoever a plaintiff may have sent to get the statement from the attending physician, it cannot have been in the contemplation of the parties interested in an insurance policy that the statement from the physician is to include what outsiders may have said, especially when, as here, it is proved that plaintiff never saw, heard of, or approved such hearsay. Had this not clearly appeared, the assumption would obtain that Dr. Arnold was plaintiff's agent in procuring Dr. Pearsall's statement and was authorized to say and do what would be reasonably necessary to procure such a statement as called for by this blank form of proofs furnished by defendant. The blanks can scarcely be said to call for such hearsay recitals as were here inserted.

Appellant cites Thornell v. Missouri State L. Ins. Co. (Tex. Civ. App.) 229 S. W. 653, affirmed by commission of appeals in 249 S. W. 203, on the proposition that Dr. Arnold was authorized to procure Dr. Pearsall's statement and that the statement was admissible as evidence of the facts contained therein. But we submit that the facts there appearing when the trial court ruled are not at all similar to those under which the court acted in the case at bar.

It is perhaps not out of the way to say that the hearsay recitals do not show a defense. They do not fix the time of the previous epileptic or epileptiform attacks. If these occurred after the policy issued they have no bearing. There is no medical evidence as to how or when epilepsy starts or develops. For aught appearing in this record, it may come upon a person unexpectedly at any period of life. There is nothing to indicate that if there has been one attack there must have been a previous one. If the insured was not afflicted with any form of epilepsy when his application for the

policy was presented and accepted, there should be a recovery even though death was caused by epilepsy.

The decision heretofore rendered is adhered to, and the order remains affirmed.

