DAILEY E. JONES, Plaintiff-in-Error,

*v.*

LENOIR CITY CAR WORKS, Defendant-in-Error.

392 S.W.2d 671.

(*Knoxville,* September Term, 1964.)

Opinion filed July 14, 1965.

ACUFF & ACUFF, Knoxville, for plaintiff in error.

DONALDSON, MONTGOMERY & KENNERLY, Knoxville, for defendant in error.

MR. JUSTICE CHATTIN, delivered the opinion of the Court.

Plaintiff-in-error, Dailey E. Jones, hereinafter referred to as petitioner, brought this action for workmen's compensation benefits due to an alleged occupational disease, silicosis, contracted in the course of his employment against the defendant, Lenoir City Car Works.

The defendant relied upon the one year statute of limitations which, after a hearing, was sustained by the trial judge and dismissed petitioner's suit.

Petitioner has perfected an appeal in error to this Court. The errors assigned complain of the action of the trial judge in admitting an extrajudicial statement of petitioner into evidence; and that there is no material evidence to support the judgment.

The facts are petitioner was sixty-one years of age at the time of the trial, June 24, 1964. He had an eighth grade education. He was employed by the defendant as a coremaker. Sand and silicate clays were used to make the cores. In the process of making the cores, dust ladened with airborne particles of silicate was created.

It is the theory of the petitioner the breathing of the silicate dust caused the contraction of silicosis.

Petitioner had worked on and off for the defendant over a period of forty years. Approximately eight years prior to the trial, he was examined by defendant's physician and x-rays were made of his chest. He was told at this time he should quit smoking and drinking. Periodically during this period of time, the defendant's physician had examined and taken x-rays of petitioner's chest.

During the month of January 1963 he was examined twice by the defendant's physician. At no time was he advised by the physician of the condition of his health.

Petitioner testified at the trial, as follows:

"Q. Have you been under the care of a doctor here?

"A. I've been under 'Doc' Freedman for the last two years I guess.

"Q. Do you know what his diagnosis has been as to your condition of your lungs?

"A. Well, he said that it was pretty rugged; told me.

"Q. What do you mean by 'pretty rugged'? Just tell the court.

"A. Well, this bronchitis and this dust, I reckon is what he had reference to.

\* \* \* \* \* \*

"Q. What did Dr. Freedman tell you about working —your working condition?

"A. Well, he told me I wasn't able to work or do nothing."

He testified on his pre-trial deposition, which is filed in the record, as follows:

"Q. Well, when did you first notice that condition? When did you first—

"A. Well, just like I told you, just so bad, it happened about three years ago, you know, when I was having these attacks, see.

"Q. Well, how would you feel? Was there pain or what was the matter?

"A. Yeah, pain. Go through there, and I'd get sore.

"Q. You say 'through here.' That would be your chest?

"A. Yeah, and then just seemed like a ball of fire or something going across there."

He had been under the care of Dr. Harold D. Freedman since May 1962. Dr. Freedman had treated him for "hy-

pertension and extreme weakness ·with shortness of breath."

In May 1963, he went to Dr. Robert W. Newman, who hospitalized him and made tests at the University of Tennessee Hospital. He was in the hospital for about five days after which, he returned to work. He worked for two weeks, but pain in his chest grew worse and he quit his work on July 19, 1963. Eight weeks after the tests were run at the hospital, Dr. Newman informed petitioner he silicosis.

After petitioner quit work· he made application for retirement benefits.

On August 30, 1963, petitioner was requested to make a statement as to his application for. retirement. His statement was recorded on a dictaphone recorder. In answer to questions of Mr. T. C. Mims, Claim Agent, petitioner stated he had had shortness of breath for about five or six years and that it had progressively become worse. He also stated he had always thought this condition was caused from inhaling the silicate dust.

He further admitted he had talked with Mr. J. E. Griffith, Claim Agent, in January and February of 1960; and that Griffith told him at first he had a "cavity" in his right lung. That on the second occasion he talked with Griffith he told him he had a spot on his lung.

Counsel objected to the introduction of the foregoing extrajudicial statements on the grounds that petitioner was not represented by Counsel at the time and the statements were not under oath. The trial judge overruled the objection.

The record shows, however, on the trial of the case, petitioner, on cross examination, admitted the truth of the statements.

■ It is settled that in this State that prior inconsistent statements of a witness are admissible for the purposes of impeachment and testing the credibilty of the witness, but are not to be considered as substantive evidence of the truth of the matter asserted therein. *Moseley v. Goodman*, 138 Tenn. 1, 195 S.W. 590 (1917); *King v. State*, 187 Tenn. 431, 215 S.W.2d 813 (1948); *Rhea v. State*, 208 Tenn. 559, 347 S.W.2d 486 (1961).

■ But, where the witness, on cross examination and under oath, affirms the truth of the extrajudicial statements, he is then subject to the safeguards of the hearsay rule, and the statements may then be considered as substantive evidence of the truth of the matter asserted. *McFarlin v. State*, 214 Tenn. 613, 381 S.W.2d 922 (1964).

■ Moreover, "[a]ny statement, whether oral or written, made by or attributable to a party to an action, which constitutes an admission against his interest and tends to establish or disprove any material fact in the case, is competent evidence against him in such action." 31A C.J.S. Evidence sec. 272, page 697; *Nelson v. Rural Educational Ass'n.* 23 Tenn.App. 409, 134 S.W.2d 181 (1939).

■ We are of the opinion the trial judge was not in error in admitting this evidence. We overrule petitioner's assignment on this point.

We now consider whether there is any material evidence to support the finding of the trial judge petitioner's action was barred by the statute of limitations of one year.

T.C.A. Section 50-1108 provides:

"The right to compensation for an occupational disease shall be forever barred unless suit therefor is commenced within one (1) year after the beginning of the incapacity for work resulting from an occupational disease * * *."

In construing the foregoing provision this Court, in the case of *Adams v. American Zinc Company,* 205 Tenn. 189, 326 S.W.2d 425 (1959), said: "[T]hat 'the beginning' of the incapacity for work resulting from an occupational disease, within the meaning of Section 50-1108, T.C.A., is when such occupational disease, with the knowledge of the employee, or knowledge that he should have had in the exercise of reasonable caution, that he has an occupational disease and that it has injuriously affected his capacity to work to a degree amounting to a compensable disability."

Petitioner testified at the trial the first time he realized he had silicosis was when Dr. Newman told him. He thought he was suffering from bronchitis.

However, in the statement to Mr. Mims he testified, as follows:

"Q. It is my understanding that you have applied for retirement?

"A. That's right.

"Q. What is the basis of your application for retirement?

"A. The basis of my retirement is I have had a shortness of breath, and so the Company has been sending me up there to have these x-rays made, and they took a number, I don't know, about thirty, probably

thirty or more x-rays of me, and most of the x-rays were on my right side, of my right lung. I kept working as long as I could, and it seemed like every day got worse on me. I was willing to work, but—you know, what my mind is, but my physical strength, you see, I couldn't hold out, the exertion. I would go over there and maybe work an hour or something like that, and I would have to rest for a good bit then.

"Q. How long has this existed, Mr. Jones?

"A. Well, I have noticed it for about five or six years.

"Q. About five or six years. You have had this shortness of breath—

"A. Yeah, it gets worse, see, but I noticed the first symptoms of it, I guess, about six years ago.

"Q. Being short of breath. Did you have a cough or anything like that?

"A. No I didn't seem to have any cough; it was shortness of breath.

\* \* \* \* \* \*

"Q. Did you know what was wrong with you? When did you learn what was wrong with you?

"A. Well, I didn't know exactly what was wrong. I thought I knew. And I have been exposed—

"Q. What did you think it was?

"A. Well, I thought it was my lungs, because they kept hurting.

"Q. You know what caused it, what you thought caused it?

"A. Well, I thought it was that dust—I always did think that was what caused it.

"Q. In other words, are you saying that you have been suffering now five or six years—

"A. Yeah, I guess I have right about that.

"Q. You thought that working in the foundry was, inhaling dust, and all, was causing this?

"A. Yeah, and I believe that silica, when I worked in silica was the starting of it.

\*   \*   \*   \*   \*   \*

"Q. In other words, you have been aware for a number of years that your health was failing, and you attributed it to working there?

"A. Yeah, that is what I think it is, yeah.

\*   \*   \*   \*   \*   \*

"Q. All right. Mr. Jones, do you remember in February of 1960—there again is a date which I don't have any idea whether you remember of not, but I am trying to get to a point here—do you remember talking to a Claim Agent named J. E. Griffith?

"A. Yeah.

"Q. In Knoxville?

"A. I do.

"Q. Or along about two years ago or three years ago?

"A. Yeah. I believe that was before the office burned down over there. I believe it burned down in 1959.

"Q. You spoke with him in February 1960? Does it seem to you like it was about three years ago?

"A. Well, I would think it would probably be around three or four years.

"Q. Do you recall what Mr. Griffith told you then?

"A. Well, Mr. Griffith told me two or three different things. That I couldn't figure out. He first said that I had a cavity and I asked him if it was my right lung, and he said 'yes.' Well, then when the office burned down the Manager called me and wanted me to go to see Mr. Griffith.

"Q. That was Mr. Marius?

"A. Yeah. And so I went to the bus station, and met Mr. Griffith, and we went over there, and had a talk.

"Q. What was that conversation about?

"A. Well, it was about the same thing, see, about my health, in general.

"Q. Were you intending to retire at that time?

"A. No, the Manager and us had talked about it, see. And my health, you know, wasn't too good from that sand, you know.

"Q. I see.

"A. And we had talked about it.

"Q. You thought at that time that your health was bad because of your working environment here?

"A. Yeah, I did.

"Q. At Lenoir Car Works?

"A. Yeah. And then he went ahead then and was talking about the dust being on the spot on my lung.

* * * * * *

"Q. I see. Then in 1960 Mr. Griffith, the Claim Agent, was telling you then that your medical, x-rays and medical examination, had revealed that you had something—either a cavity or something wrong with your lungs—

"A. He said a cavity the first time, and when I went to Knoxville he said it was a spot. And I asked him if it was on my right lung, and he said, yeah, so I figured that might be the right lung because they took so durn many of them x-rays of my right lung, see.

"Q. You were feeling bad, I believe you said back in 1960? And before?

"A. Yeah.

"Q. And when he told you this, that something was wrong with your lungs, you figured then that you had an occupational disease?

"A. Yeah.

"Q. In other words, from this Lenoir Car Works?

"A. Exposure, yeah.

"Q. I see but you continued working until, I believe you said, July what this year?

"A. About July 19, I believe it was.

"Q. But you have been aware of this occupational disease for some length of time?

"A. Well, I thought that was it. That is what he then finally told me. That is all he ever told me."

From the foregoing admission and the other testimony of petitioner, it is apparent petitioner knew he had a spot and silica dust on his right lung almost four years

prior to the filing of his petition in December 1963; that he thought he had an occupational disease; that it was necessary for him to rest at intervals during his working hours; and that due to the condition of his lung his capacity to work had been affected.

The record also shows that Mr. Griffith suggested to petitioner that he retire. But petitioner stated he would not make application for retirement because he would have to see a doctor. He did not see a doctor until May 1962.

Thus, it is our opinion there is material evidence to support the finding of the trial court that petitioner, more than one year prior to the filing of his petition in this cause, had knowledge or in the exercise of reasonable caution should have had knowledge he was suffering from an occupational disease, and that the disease had injuriously affected his capacity to work to a degree amounting to a compensable disability.

This Court, in an opinion by Chief Justice Burnett, said:

"The Legislature in enacting the compensation act expressly entrusted the trial court with the power to find the facts and when such facts are supported by any material evidence, even if this Court thinks the evidence points otherwise, the trial court must be affirmed." *General Shale Prod. Corp. v. Casey,* 202 Tenn. 219, 303 S.W.2d 736 (1957).

Again, in the case of *Hartwell Motor Company v. Hickerson,* 160 Tenn. 513, 26 S.W.2d 153 (1930), the following was quoted with approval:

"If the findings are supported by inferences which may fairly be drawn from the evidence even though the

evidence be susceptible of opposing inferences, the reviewing court will not disturb the award." *Hartford Acc. & I. Co. v. Industrial Acc. Com. of California,* 202 Cal. 688, 262 P. 309, 58 A.L.R. 1392

In the case of *Riley v. Knoxville Iron Company,* 178 Tenn. 107, 156 S.W.2d 398 (1941), this Court approved the following rule:

"When there are certain facts proved, the court not only may, but it is its duty to draw therefrom legitimate inferences that seem most reasonable." *Czuczko v. Golden—Gary Co.,* 94 Ind.App. 47, 177 N.E. 466, 179 N.E. 19.

In *White v. Whiteway Pharmacy, Inc.,* 210 Tenn. 449, 360 S.W.2d 12, this Court, in an opinion by Mr. Justice White, said:

"It is a well settled principle of law in this State that in a Workmen's Compensation Case findings of fact of the trial court will not be disturbed on appeal if supported by any material evidence and this is true even though the preponderance of the evidence is against the finding of the trial court."

█ There being material evidence in the record to support the finding by the trier of the facts that petitioner knew, or by the exercise of reasonable caution should have known, that he had an occupational disease which had "injuriously affected his capacity to work to a degree amounting to a compensable disability" for more than one year prior to the filing of his petition herein, we must overrule petitioner's assignment of error on this point.

It results all assignments are overruled and the judgment of the trial court is affirmed with costs.

BURNETT, CHIEF JUSTICE, and WHITE, DYER and HOLMES, JUSTICES, concur.