448 F.2d 528
 Louis E. SHELL and Catherine Shell, Parents and Next of Kin
of Louis Pat Shell, Deceased, Plaintiffs-Appellees,
v.
Charles PARRISH, Individually and dba Parrish Construction
Co., Defendant, Cordova Sand and Gravel Company,
Defendant-Appellant.
 No. 20952.
 United States Court of Appeals,
Sixth Circuit.
 Sept. 24, 1971.
 
 Leo Bearman, Jr., Memphis, Tenn., for defendant-appellant; Leo Bearman, Memphis, Tenn., on brief.
 Lucius E. Burch, Jr., Memphis, Tenn., for plaintiffs-appellees; James T. Allison, Clifton & Mack, Burch, Porter & Johnson, Memphis, Tenn., on brief.
 Before WEICK, CELEBREZZE and KENT, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 In an action for damages for the wrongful death of their 9-year-old son, Louis Pat Shell, the plaintiffs recovered a judgment against the defendants in the District Court, which judgment was entered upon a jury verdict in the amount of $200,000. Subsequently the defendant Parrish settled the judgment against him for $25,000, thereby reducing the judgment to $175,000. Cordova Sand and Gravel Company (Cordova) has appealed therefrom.
 
 
 2
 The accident occurred in Tennessee, and the law of that state governs as to the substantive issues in the case.
 
 
 3
 Cordova was the owner of a tract of land, a large portion of which had already been developed as a 108-acre-subdivision for residences. The remainder of the land, consisting of a field, was in the process of development. Cordova had contracted with Parrish, an independent contractor, for the construction of sewers, drainage, curbs and gutters in the field. Parrish dug a trench about seven feet deep and laid eight-inch pipe therein. The pipe was covered with sand and dirt, but the trench had not been filled in Dirt was piled on both sides of the trench. On the day of the accident no men were working at the trench because it had rained previously and the ground was too wet.
 
 
 4
 The original complaint alleged that Louis Pat Shell, in company with another boy, was playing in the area of the open trenches. It further alleged:
 
 
 5
 "The boys were walking along the edge of an open sewer trench when the edge where Louis Pat Shell was walking suddenly gave away and he fell in the trench with the side of the trench caving in on top of him. * * * [A]nd he died from suffocation * *."
 
 
 6
 It was the claim of plaintiffs that the area had been used by children as a playground; that it also constituted an attractive nuisance; that the boys were not trespassers; and that the defendants were negligent in leaving the trenches open and unguarded, in not filling them with earth or properly shoring them.
 
 
 7
 At the commencement of the trial, plaintiffs were granted leave to amend their complaint by eliminating the allegation that the boys were walking along the edge of the open sewer trench which suddenly gave away causing Pat to fall in the trench. The amended complaint alleged instead that the boys were walking inside the open trench when suddenly and with no warning the side of one bank caved in on top of Pat Shell.
 
 
 8
 The allegations of the original complaint constituted an admission against interest, but defendants did not offer that complaint in evidence. Where a pleading has been amended or superseded by another pleading, it is necessary that a party offer in evidence the original or superseded pleading if he desires to make use of an admission therein contained. Raulie v. United States, 400 F.2d 487, 526 (10th Cir. 1968); Giannone v. United States Steel Corp., 238 F.2d 544, 547 (3d Cir. 1956); Borel v. United States Cas. Co., 233 F.2d 385, 387-388 (5th Cir. 1956); 4 Wigmore on Evidence, Sec. 1067; 31A C.J.S. Evidence Sec. 304; 29 Am.Jur.2d Evidence Secs. 693, 688.
 
 
 9
 While we have on one occasion on appeal taken judicial notice of a superseded pleading, Pennsylvania R. R. v. City of Girard, 210 F.2d 437 (6th Cir. 1954), Contra, Borel v. United States Cas. Co., supra, we think the better rule is against such practice.
 
 
 10
 Cordova contends that the District Court erred in excluding from the Certificate of Death, which it offered in evidence, the words "Victim fell in open ditch." The District Court excluded the language from the certificate because the physician who signed it had obtained that information from investigating officers and because Pat's companion, Steven Giakis, had given testimony which "overwhelmingly refutes it" [that information].
 
 Tennessee statute provides:
 
 11
 "Each certificate provided for in this chapter, filed within six (6) months after the recorded event occurred, shall be prima facie evidence of the facts therein stated. * * *" T.C.A. Sec. 53-413.
 
 
 12
 The question whether the evidence of the Giakis boy was sufficient to rebut the prima facie evidence provided by the Certificate of Death was for the jury, and not the Court, to decide. The fact that the doctor who signed the certificate obtained some of the facts stated therein from investigating officers goes to the weight to be given to it and not to its competency.
 
 
 13
 It cannot be gainsaid that the statement, "Victim fell in ditch," is a statement of fact. It was included in the answer to a question in the form which Tennessee law required to be executed. The authority of Tennessee to enact such a statute in dealing with its vital statistics, has not been challenged.
 
 
 14
 In our opinion the Certificate of Death in its entirety was admissible in evidence under state as well as federal law. The Court committed prejudicial error in excluding part of the Certificate.
 
 
 15
 Under Rule 43, Fed.R.Civ.P., the statute or rule which favors the reception of evidence governs.
 
 
 16
 We have not found any Tennessee decision construing T.C.A. Sec. 53-413 with respect to the precise question here involved, and the parties have not cited any to us. While there appears to be some conflict in the authorities from other states, we are of the opinion that the better reasoned decisions support the admissibility of the Certificate. Marker v. Prudential Ins. Co. of America, 273 F.2d 258 (5th Cir. 1959); Hunter v. Derby Foods, Inc., 110 F.2d 970 (2d Cir. 1940) (applying both federal and state law); Blados v. Blados, 151 Conn. 391, 198 A.2d 213 (1964) (holding court erred in deleting from certificate the language, "apparently fell from the rear stairs striking his head"); Walcott v. Sumner, 308 Mass. 413, 32 N.E.2d 685 (1941) (holding court erred in striking from certificate the words, "fell down stairs"); Harrington v. Interstate Business Men's Acc. Ass'n, 232 Mich. 101, 205 N.W. 116 (1925).
 
 
 17
 The Certificate of Death was also admissible under federal law. 28 U.S.C. Sec. 1732; Thomas v. Conemaugh & Black Lick R. Co., 234 F.2d 429 (3d Cir. 1956); Hunter v. Derby Foods, Inc., supra; Smith v. John Hancock Mut. Life Ins. Co., 254 F.Supp. 622 (W.D.Pa.1966) (holding admissible certificate which contained words, "accident" and "lost control of car and struck culvert").
 
 
 18
 The certificate was admissible as prima faci evidence as to how the accident occurred, and could be considered along with the admissions in the original complaint if it is offered in evidence in the retrial of the case. That the boys had been playing on the mounds of wet ground at the top of the trenches appears from the Giakis boy's testimony on cross-examination by counsel for Parrish. He testified:
 
 
 19
 "Q. Well, do you remember that there was water down in the bottom of the ditch? A. Yes, sir.
 
 
 20
 Q. Now when you-all first got over there, you saw these-After you got over there you saw these mounds of dirt, is that right? A. Yes, sir.
 
 
 21
 Q. And what did you-all decide to do on the mounds of dirt? A. Play on them.
 
 
 22
 Q. And did you play any particular game? A. We played 'King of the Hill'.
 
 
 23
 Q. King of the Hill? A. Yes, sir.
 
 
 24
 Q. You and Pat? A. Yes, sir.
 
 
 25
 Q. Is that where one of you would get on top of the hill and the other tries to get him off? A. Yes, sir.
 
 
 26
 Q. And the one that stays up on top of the mound and up on top of the hill, he is the 'King of the Hill' until the other one gets him off? A. Yes, sir.
 
 
 27
 Q. Now these mounds of dirt were right there in the same area that the ditches were, weren't they? A. Yes, sir." (App. 50)
 
 OTHER ERRORS
 
 28
 It is necessary that we rule on other claims of error to furnish guidance on the retrial of the case. The next claim relates to the issue of contributory negligence of the parents of the deceased boy.
 
 
 29
 The District Court submitted to the jury the issue of contributory negligence of Pat, instructing the jury as to the presumption under Tennessee law that children between the ages of seven and fourteen years are presumed to be incapable of contributory negligence until evidence to the contrary overcomes that presumption. Pat was nine years and ten months old. Counsel for his parents stated his capabilities as follows:
 
 
 30
 "He was a child of outstanding promise. His intellectual motivation was remarkably high causing him to rank in the top 20% of the population of children of his age. In reading and Arithmetical Concepts he was in the top 3%-5% of the population. Although he was only at the beginning of the third grade he was operating comparably to normal children at the fifth grade level and this superior performance was caused by high motivation." (Appellee's Brief, p. 43).
 
 
 31
 The applicable provisions of the Tennessee wrongful death statute, T.C.A. Sec. 20-607, are to the effect that the right of action of a person, whose death is caused by wrongful act, shall not abate but shall pass to his parents. They are the real parties in interest and are the plaintiffs in this case. Whitley v. Georgia Western & Watkins Motor Lines, Inc., 299 F.Supp. 1238 (E.D.Tenn.1969); Herrell v. Haney, 207 Tenn. 532, 341 S.W.2d 574 (1960); Cummins v. Woody, 177 Tenn. 636, 152 S.W.2d 246 (1941); Sanders Adm'x v. Louisville & N. R. R., 111 F. 708 (6th Cir. 1901).
 
 
 32
 It was the contention of Cordova that the parents of Pat were contributorily negligent in not properly supervising their child and in that his mother had given him permission to play in the field where the construction project was being carried on. The parents had knowledge of the construction project not far from their residence. They offered testimony to the effect that children were playing there during the construction period and that the defendants also knew of it. Mr. Shell testified that he had instructed Pat not to play in the area of the ditches and, in general, always to play within sight of the family home.
 
 
 33
 The District Court ruled as a matter of law that the parents were not contributorily negligent, either proximately or remotely, and that Pat's mother had not given him permission to wade in the field. The testimony that she had given such permission was supplied in an evidentiary deposition of Pat's companion, 12-year-old Steven Giakis, which deposition was taken by consent and the testimony was elicited in questions propounded on direct examination by counsel for plaintiffs. The relevant portion of the testimony is set forth in footnote 1.[1] The deposition was read to the jury without any objection from the plaintiffs.
 
 
 34
 At the close of the evidence the Court granted a motion made by counsel for plaintiffs to strike the testimony of the Giakis boy "insofar as it creates an issue of contributory negligence on the part of the parents", on the ground that the testimony included double hearsay to the effect that the mother of the boy had granted permission for them to go and wade. The plaintiffs thus were successful in having stricken the Giakis boy's testimony which they had elicited.
 
 
 35
 Initially, the fact that the disputed testimony is double hearsay should not present any difficulties in and of itself. Hearsay within hearsay should not be excluded if each separate hearsay component conforms to an exception to the hearsay rule. See, Rule 805, Note, Rev. Draft of Proposed Rules of Evidence for the United States Courts:
 
 
 36
 "On principle it scarcely seems open to doubt that the hearsay rule should not call for exclusion of a hearsay statement which includes a further hearsay statement when both conform to the requirements of a hearsay exception. Thus a hospital record might contain an entry of the patient's age based on information furnished by his wife. The hospital record would qualify as a regular entry except that the person who furnished the information was not acting in the routine of business. However, her statement independently qualifies as a statement of pedigree (if she is unavailable) or as a statement made for purposes of diagnosis or treatment, and hence each link in the chain falls under sufficient assurances. Or, further to illustrate, a dying declaration may incorporate a declaration against interest by another declarant." See McCormick Sec. 290, p. 611.
 
 
 37
 It is now incumbent to determine whether the hearsay statements are admissible as exceptions to the hearsay rule. As far as the deceased being the out-of-court declarant is concerned, it is not necessary to determine whether his declaration is to be characterized as an admission or a statement against interest. The practical effect is the same. If he is not considered a party in this suit, his statement could still satisfy the "statement against interest" exception, because the deceased is obviously unavailable to testify. This satisfies Wigmore's Necessity requirement. 5 Wigmore Sec. 1455. The other requirement is a Circumstantial Probability of Trustworthiness. 5 Wigmore Sec. 1455. In this case it is the deceased's statement against his interest, in that it bears upon possible contributory negligence of the deceased.
 
 
 38
 "Declarations, to be distinguished from admissions, as to facts relevant to the matter of inquiry, are admissible in evidence when it appears that the declarant is dead, that the declaration was against his pecuniary or proprietary interest, and that he had no probable motive to falsify the fact declared." Tom Love Co. v. Maryland Cas. Co., 166 Tenn. 275, 277, 61 S.W.2d 672, 673 (1933).
 
 
 39
 Concerning the part of the Giakis boy's testimony relating what the mother of deceased allegedly said, we have already determined that she is a party to this action. Any statement made by her, if properly introduced, is admissible as an admission against her interest. Jones v. Lenoir City Car Works, 216 Tenn. 351, 392 S.W.2d 671, 673 (1965), 31A C.J.S. Evidence Sec. 217 b.
 
 
 40
 Is her out-of-court statement, allegedly spoken to the decedent, and testified to by Giakis although not heard by him, admissible as an admission by a party in the suit? The obvious difficulty with this is the fact that the witness, Giakis, did not overhear the alleged admission. For the reasons hereafter stated, we believe the evidence was admissible.
 
 4 Wigmore Sec. 1048:
 
 41
 "The statements made out of court by a party-opponent are universally deemed admissible, when offered against him. * * *
 
 
 42
 "[W]hen offered against the party they have additionally, the same logical status as a witness' self-contradiction. Just as a witness' testimony is discredited when it appears that on another occasion he has made a statement inconsistent with that testimony (ante, Secs. 1018ff.), so also the partyopponent is discredited when it appears that on some other occasion he has made a statement inconsistent with his present claim against him. The witness speaks in court through his testimony only, and hence his testimony forms the sole basis upon which the inconsistency of his other statement is predicated. But the partyopponent, whether he himself takes the stand or not, speaks always through his pleadings and through the testimony of his witnesses put forward to support his pleadings; hence the basis upon which may be predicated a discrediting inconsistency on his part includes the whole range of facts asserted in his pleadings and in the testimony relied on by him.
 
 
 43
 "Thus, in effect and broadly, anything said by the party-opponent may be used against him as an admission, provided it exhibits the quality of inconsistency with the facts now asserted by him in pleadings or in testimony. (This proviso never needs to be enforced, because no party offers thus his opponent's statement unless it does appear to be inconsistent.)
 
 
 44
 "(2) But, regarded from the point of view of the legal rules of Admissibility, the party's extrajudicial statements, like all other extrajudicial statements, are met and challenged by the Hearsay rule (post Sec. 1361). How is it, then (since they are nevertheless admissible against the party-opponent), that they are able to pass the gauntlet of the Hearsay rule?
 
 
 45
 "Very simple. The answer is that the party's testimonial utterances do not pass the gauntlet of the Hearsay rule when they are offered for him (unless they can satisfy some exception to that rule); but that they do pass the gauntlet when they are offered against him as opponent, because he himself is in that case the only one to invoke the Hearsay rule and because he does not need to cross-examine himself.
 
 
 46
 "The theory of the Hearsay rule is that an extra-judicial assertion is excluded unless there has been sufficient opportunity to test the grounds of assertion and the credit of the witness, by cross-examination by the party against whom it is offered; e. g. if Jones had said out of court 'The partyopponent Smith borrowed this fifty dollars,' Smith is entitled to an opportunity to cross-examine Jones upon that assertion. But if it is Smith himself who said out of court. 'I borrowed this fifty dollars,' certainly Smith cannot complain of lack of opportunity to cross-examine himself before his assertion is admitted against him. Such a request would be absurd. Hence the objection of the Hearsay rule falls away, because the very basis of the rule is lacking, viz. the need and prudence of affording an opportunity of cross-examination.
 
 
 47
 "In other words, the Hearsay rule is satisfied; Smith has already had an opportunity to cross-examine himself; or (to put it another way) he now as opponent has the full opportunity to put himself on the stand and explain his former assertion."
 
 
 48
 See also Watts v. Delaware Coach Co., 44 Del. 283, 58 A.2d 689 (1948).
 
 
 49
 The same justification would seem to apply in the instant case. The question of the parents' contributory negligence is a vital issue in the case. If the alleged admission of Mrs. Shell is unexplained it could prevent recovery. The alleged "admission" of Mrs. Shell is obviously contrary to the testimony of Mr. Shell, who stated that his wife was not even at home at that particular time. The basis of the hearsay rule is that it precludes the admission of testimony by a witness which is not subject to cross-examination and confrontation. 5 Wigmore Sec. 1362. This should not be an impediment here because the out-of-court declarant of the "admission," Mrs. Shell, would seem to be available as a witness, and would therefore have "the full opportunity to * * * explain [her] former assertion." 4 Wigmore Sec. 1048.
 
 
 50
 Supporting this line of argument is the following excerpt from Jones On Evidence 2:316 (5th ed.):
 
 
 51
 "There is no good reason why a hearsay declaration, which within itself contains a hearsay statement, should not be admissible to prove the truth of the included statement if both the statement and the included statement meet the tests of an excepion to the hearsay rule.
 
 
 52
 "Probably one of the best illustrations of its application is the record of the history of an accident given by the victim upon his arrival at the hospital, contained in the hospital record of the patient. The business entries exception permits proof of the fact of the making of a statement by the patient, and the admissibility of what he said would depend in turn, of course, upon whether his statement was an admission, a res gestae or spontaneous statement, a dying declaration or a declaration against interest."
 
 
 53
 According to Giakis, after Pat had obtained permission from his mother, they went directly to the ditch, first playing "King of the Hill" on top of the ditch and then going down into the ditch.
 
 
 54
 The testimony of Giakis was also competent to contradict the testimony of Mr. Shell to the effect that the mother was not at home at the time.
 
 
 55
 It must be remembered that plaintiffs relied on the testimony of Giakis to prove that the boys were walking in the ditch at the time of the accident.
 
 
 56
 Contributory negligence of one parent is imputable to the other parent so as to preclude recovery by or for the benefit of the parents, or either of them, in an action for the wrongful death of the child. Smith v. Henson, 214 Tenn. 541, 381 S.W.2d 892 (1964); Nichols v. Nashville Housing Authority, 187 Tenn. 683, 216 S.W.2d 694 (1949); Cleghorn v. Thomas, 58 Tenn.App. 481, 432 S.W.2d 507, 511 (1968).
 
 
 57
 We conclude that it was error for the Court not to submit to the jury the issue of contributory negligence of the parents.
 
 
 58
 Cordova further contends that it was error for the Court to deny a requested instruction to the jury that they could draw an unfavorable inference from the mother's failure to testify.
 
 
 59
 The Giakis boy's testimony, which the Court admitted and then rejected, has been held by us to be competent and requires an explanation from her. If she was unable to testify because of her condition of health, she should have procured a medical certificate. This issue may not occur on the retrial as she may testify.
 
 
 60
 We find no error in submitting to the jury the issues of attractive nuisance and playground. The Court gave proper instructions thereon according to the law of Tennessee, and also on the liability of the owner of the premises. Nor is it necessary that we consider the claim that the verdict is grossly excessive and four times greater than ever approved by an appellate court in Tennessee. Also, other errors are charged which we do not believe merit discussion.
 
 
 61
 The judgment of the District Court is reversed and the cause is remanded for a new trial.
 
 
 
 [1]
 Deposition of
 MASTER STEVEN GIAKAS
 The said witness, having been first duly sworn, testified as follows:
 Direct Examination by Mr. Allison
 Q. Your name is Steven Giakas? A. Yes, sir.
 Q. How old are you, Steven? A. Twelve.
 Q. And your live in Memphis, Tennessee? A. Yes, sir.
 Q. What is your address? A. 1439 Kinliworth.
 Q. What school do you go to, Steven? A. Riverdale.
 Q. What grade are you in? A. Sixth.
 Q. Steven, do you remember an incident, an accident that happened with Pat Shell several years ago? A. Yes, sir.
 Q. And at that time where did Pat Shell live? A. Two houses down.
 Q. On this same street? A. Yes, sir.
 Q. Did the accident happen in the summertime, if you remember? A. Yes, sir.
 Q. How long had you lived in this neighborhood when the accident happened? A. We just moved in. I don't remember exact-how long.
 Q. How long had you known Pat Shell, if you remember? A. I don't remember.
 Q. The day the accident happened, when did you first see Pat Shell? A. In the morning.
 Q. Was it at your house or at Pat's house? A. I think it was at my house.
 Q. Did you-all play a little while at your house? A. I don't remember.
 Q. Did you leave your house and go somewhere else? A. No, we went over to Pat's house.
 Q. How long did you stay there? A. He just asked his mother if we could go.
 Q. And where were you and Pat going to go? A. Out to the field to wade in the water.
 Q. How far is the field from your house and Pat's house? A. About three or four blocks.
 Q. Was this a pretty day, if you remember it? A. Yes, sir.
 Q. It wasn't raining or anything? A. No, sir.
 Q. Was it in the morning or afternoon? A. Morning.
 Q. Where were you when Pat asked-went up to his house? A. I was in the yard.
 Q. And did you watch Pat do this? A. Yes, sir.
 Q. What did he do? A. He went up and knocked on the door, and his mother came, and he asked if we could go wade in the water.
 Q. Did you hear what Pat was saying? A. No, sir.
 Q. You didn't hear what he said? A. No, sir.
 Q. How long did he stay at the door? A. A few minutes, not long.
 Q. And then he came back and joined you? A. Yes, sir.
 Q. And what did the two of you do then? A. He just said that he asked his Mamma and he could go.
 Q. And then where did you-all go? A. Out to the field.
 Q. Did you talk to anybody on your way down there? A. No, sir.
 Mr. Bearman: I didn't hear.
 Mr. Allison: I asked him did he talk to anyone and he said No.
 Mr. Bearman: Speak up just a little. Hold that gun back just a little, boy. It must be bubble gum; that is what I buy for my grandchildren.
 Q. Where was the water down in the field? A. It was in a ditch.
 Q. After you got down to the field, did you go in the ditch? A. No, we played on these hills, mounds of dirt.
 Q. For how long, just a little while? A. Yes, sir, ten minutes.
 Q. And then what did you do after you finished playing on the hills, mounds of dirt? A. We went down in the ditch.
 Q. How did you get down in the ditch? A. Walked.
 Q. Did you have to jump down in it, or was there a place where you could walk down? A. We just walked down.
 Q. And then when you got in the ditch, what did you do, you and Pat? A. Started playing round, walking.
 Q. Down in the ditch? A. Yes, sir.
 Q. What was the ground like in the ditch? A. Soft and muddy.
 Q. Was there some water in there? A. Yes, sir.
 Q. Now what happened to Pat, as you saw it, down in the ditch? A. What do you mean?
 Q. Well, were you walking alongside Pat, or where was he in relation to you? A. In front of me.
 Q. And what happened to him? A. The dirt just caved on in on him.
 Q. Where did the dirt come from that caved in on him? A. On top.
 Q. On top of the ditch? A. Not on top, on the sides.
 Q. And how much dirt fell on him? A. A pretty good bit.
 Q. After the dirt fell on Pat, what could you see of Pat? A. His arm.
 Q. Was that all? A. Yes, sir.
 Q. What did you do after the dirt fell on him? A. First I tried to get him out.
 Q. By digging in the dirt? A. Yes, sir.
 Q. And you couldn't do that? A. No, sir.
 Q. And then what did you do? A. Went and got this workman.
 Q. Was it a colored man or white man? A. Colored.
 Q. What did you and the workman do? A. He went over there and saw him, and then he went across the street and got this white man.
 Q. And what did you do after that? A. Went and told Pat's father.
 Q. Did you come home after you told Pat's father? A. No, I went back down there.
 Q. Had you ever been down in that ditch before, Steven? A. No, sir.
 Q. Do you know whether Pat had or not? A. No, I don't know.
 Q. What was the dirt like that fell on Pat? Can you describe it? A. Dirt.
 Q. Ok. Was it wet or dry? A. Wet, pretty wet.
 Mr. Allison: That's all.