IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2008

## STATE OF TENNESSEE v. NICHOLAS ALLEN MONTIETH

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 07-01-0431    J. Weber McGraw, Judge**

---

**No. W2008-00266-CCA-R3-CD  - Filed March 9, 2010**

---

Following a jury trial, Defendant, Nicholas Allen Montieth, was found guilty of sexual battery by an authority figure.  The trial court imposed a sentence of three years as a Range One offender.  The sole issue raised on appeal is whether the trial court erred by not allowing Defendant to impeach the victim with testimony of a prior inconsistent statement.  Following our review of the record, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Circuit Court Reversed and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Lloyd R. Tatum, Henderson, Tennessee, for the appellant, Nicholas Allen Montieth.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

### I. Background

The thirteen-year-old victim in this case, who will be referred to by her initials S.M., testified that from November 17, 2006, until  January 12, 2007, she lived with Defendant, who was her father, Connie Green, and Ms. Green's son and three nephews.  S.M. had previously  lived with her father and stepmother, Leslie Montieth, since the age of one or two.

One night in January of 2007, Defendant came home from work around three a.m. and stayed outside while S.M. was inside watching television. When Defendant came inside, S.M. could tell that he had been drinking beer because she could smell it on his breath. He began talking to her about school and then he started tickling her. S.M. testified that Defendant put his hands down her jeans under her underwear while they were sitting on the couch. He then told her that "if a boy did something like what he was doing to [her] to tell him no and stuff." The following exchange took place at trial:

[State]:        What did [Defendant] do that night?

[S.M.]:        He put his hands down my pants.

[State]:        What were you wearing?

[S.M.]:        Some blue jeans.

[State]:        Did you have panties on under your blue jeans?

[S.M.]:        Yes.

[State]:        When he put his hands in your pants, did he put them on top of your panties or under your panties?

[S.M.]:        Under.

[State]:        Were your blue jeans fastened?

[S.M.]:        Yes.

[State]:        How long would you say that went on?

[S.M.]:        About 17 minutes.

[State]:        For you, a long time?

[S.M.]:        Um-hmmm.

[State]:        Were you sitting on the couch or lying on the couch or what when this happened?

[S.M.]:        I was sitting on the couch.

S.M. said that she told Defendant to stop, but he continued touching her.  She attempted to get up off the couch, but Defendant put his arm around her and held her down.  Defendant eventually removed his hand from her pants and left to take a shower.  S.M. testified that Connie Green was asleep on the couch during the incident, but S.M. was afraid to wake her.

S.M. testified that she eventually told Leslie Montieth what happened, and Ms. Montieth called Defendant and Ms. Green.  Afterwards, Defendant, Ms. Green, Ms. Montieth, and S.M. met at Ms. Montieth's house.  They told S.M. not to tell anyone about the incident unless it happened again.  S.M. testified that she eventually told one her friends at school that Defendant touched her and that her friend reported it to a teacher.  The teacher then took S.M. to a counselor, and S.M. told the counselor what happened.  The counselor reported the incident to employees of the Department of  Children's Services (DCS), and S.M. later gave a statement to them in Bolivar.  S.M. testified that she felt scared after Defendant touched her and that she was still upset about it.  She admitted that prior to the incident, she was a "little" mad at Defendant but said that she would not make up a story such as this to get him in trouble.  S.M. testified that she and Defendant got along before the touching occurred.

On cross-examination, the following exchange took place between S.M. and Defense Counsel:

[Defense Counsel]:  . . . Have you ever told Connie Green that when he put his [hand] down here - - Do you know where your belly button is?

[S.M.]:        Yes.

[Defense Counsel]:  Did you tell Ms. Green that he put his hand below your belly button?

[S.M.]:        No.

[Defense Counsel]:  Didn't tell her that.

[S.M.]:        I didn't tell Connie.  I told my stepmom.

[Defense Counsel]:  Ms. Leslie?

[S.M.]: Yes.

[Defense Counsel]: That your dad put his hand below your belly button, your navel?

[S.M.]: Yes.

[Defense Counsel]: Navel and belly button is the same thing; right?

[S.M.]: Yes.

[Defense Counsel]: Did you use the word "belly button" or "navel"?

[S.M.]: I just told her that he put his hands down my pants.

[Defense Counsel]: Okay. And didn't they ask you about whether it was just below your belly button and not all the way down?

[S.M.]: No.

[Defense Counsel]: They didn't. Did you ever tell them that this, what you told earlier, that that didn't happen?

[S.M.]: Huh?

[Defense Counsel]: Did you ever tell Connie that that didn't happen?

[S.M.]: No.

[Defense Counsel]: Do you remember talking to her about two or three days later and telling her it didn't happen?

[S.M.]: No.

[Defense Counsel]: This Joseph Horn, the sixteen year old boy, was he in the room when you talked to Connie?

[S.M.]: No. He was at a friend's house.

[Defense Counsel]: What about Ms. Leslie? Was she in the room two or three days later when y'all talked about this?

[S.M.]: No.

[Defense Counsel]: She wasn't. Did you ever tell Ms. Leslie that this didn't happen - -

[S.M.]: No.

[Defense Counsel]: - - the way you talked earlier?

[S.M.]: No.

[Defense Counsel]: When this happened, you said that he was talking about boys; right?

[S.M.]: Yes.

[Defense Counsel]: And it was - - he was trying to show you what to do if a boy tried to do this; is that right?

[S.M.]: Yes.

S.M. admitted that she stole an iPod from someone at school and that she also stole some money from her foster mother. Both of these incidents occurred after Defendant touched her.

Investigator Mike Kennamore of the Hardeman County Sheriff's Department testified that he interviewed S.M. on March 9, 2007, after receiving a complaint from DCS about possible sexual abuse. He said that the interview was consistent with S.M.'s trial testimony. Investigator Kennamore then interviewed Defendant at the Hardeman County Sheriff's Department, and Defendant waived his Miranda rights and gave a statement. Defendant said that on the night of the offense, he drank four beers before going into the house. He could not remember if he touched S.M.'s vagina, but stated that if he did, "it was an accident," and he did not realize that he "touched it." Defendant said that he was attempting to show S.M. what boys might do to her. He said that when he touched S.M., "[s]he jumped back and got away from me which is what she is supposed to do." Defendant said that S.M. then sat back down beside him, and they talked about school, grades, and friends. He said that Ms. Green was asleep on the couch during the incident.

-5-

Defendant told Investigator Kennamore that he, Ms. Green, and Ms. Montieth discussed the touching and that they "determined that [Defendant] didn't do anything and [S.M.] didn't need to go blabbing her mouth to other people unless it happened again, if something were to happen again."

Connie Green testified that she usually slept on the couch until 3:00 or 4:00 a.m. when Defendant arrived home from work and woke her up. At trial, the following exchange took place:

[Defense Counsel]: What, if anything, did [S.M.] say to you about an incident that we're here about in court today?

[Ms. Green]: [S.M.] didn't tell me about the incident. She told her mother and then her mother had told me.

[Defense Counsel]: Did, at some point, you talk to [S.M.] about the incident?

[Ms. Green]: Yes, sir.

[Defense Counsel]: And when was that?

[Ms. Green]: That was probably around January 30th.

[Defense Counsel]: Do you remember what day of the week it was on?

[Ms. Green]: It was on a Sunday.

[Defense Counsel]: On a Sunday. And where was this conversation?

[Ms. Green]: In Mo's house on Geneva Lane.

[Defense Counsel]: Now, who is Mo?

[Ms. Green]: Leslie Montieth.

[Defense Counsel]: Okay. Geneva Lane is where?

[Ms. Green]: In Henderson.

[Defense Counsel]: In Henderson. So you and Leslie and who else?

[Ms. Green]: It was me and Leslie and Nick - - Well, first, it was me, Leslie and [S.M.], and then when she was talking to us, then we talked to Nick.

[Defense Counsel]: Then you talked to Nick.

[Ms. Green]: Yes.

[Defense Counsel]: Okay. Now, so Nick wasn't present during this conversation --

[Ms. Green]: No.

[Defense Counsel]: - - with [S.M.]. What did [S.M.] tell you on January 30th in Henderson?

[Ms. Green]: She told us that her dad had - -

[Prosecutor]: Would that be hearsay?

[The Court]: Objection to hearsay?

[Defense Counsel]: Your Honor - -

[The Court]: Any exception?

[Defense Counsel]: May we approach?

(WHEREUPON, a bench conference was had on the record in the presence of the jury but out of the hearing of the jury and the following proceedings were had, to-wit:)

[The Court]: Is there any exception?

[Defense Counsel]: Your Honor, it's not being offered for the proof. The witness, [S.M.], denied making any statement that she's about to give.

[Prosecutor]: Well, then it is made for truthfulness.

-7-

| | |
|---|---|
| [Defense Counsel]: | This is the statement where she says it happened, touching was below the belly button or navel. |
| [Prosecutor]: | Okay. Then it is made for truthfulness. |
| [Defense Counsel]: | She denied that. |
| [The Court]: | Why is the question being asked? What's the purpose of the question? |
| [Defense Counsel]: | It goes to show [S.M.'s] untruthfulness. |
| [Prosecutor]: | Then it's made for truthfulness of the statement which is hearsay. |
| [The Court]: | Yeah. It's going to be hearsay. In order to - - You can ask her regarding her reputation but you can't get into specific acts. |

Ms. Green testified that she had known S.M. for approximately one year and that she was of the opinion that S.M. would "lie if she thinks she needs to." She also said that S.M. "rarely" told the truth.

Leslie Montieth testified that she had known S.M. for eleven years and that S.M. lived in her household when Ms. Montieth was married to Defendant. She said that S.M. was "prone to lying." Based on her conversations with friends, family, and S.M.'s psychiatrist, Ms. Montieth testified that S.M. had a reputation for not telling the truth.

The State recalled Investigator Kennamore to the stand, and the following exchange took place:

| | |
|---|---|
| [Prosecutor]: | Investigator Kennamore, in the course of your investigation of this case did you speak with Leslie Montieth? |
| [Kennamore]: | Yes, I did. |
| [Prosecutor]: | Did she give you a statement - - Did y'all discuss this case? |

[Kennamore]:          Yes, we did discuss the case.

[Prosecutor]:         In what capacity did you talk to Ms. Montieth?

[Kennamore]:          I spoke to her along with Department of Children Services was also there. We spoke with her just shortly after the interview of [S.M.]. After the interview was over, we sat down and spoke with her, talked to her about the entire case and the interview and everything, and she never gave any - -

[Defense Counsel]: Objection. Hearsay, Your Honor.

[Prosecutor]:         Judge, it's rebutting her testimony that she gave in open court.

[The Court]:          I'm going to allow the testimony.

[Kennamore]:          She never gave any indication or made any statements to indicate that [S.M.] was at any time a liar or not being truthful.

On cross-examination, Investigator Kennamore testified that what Ms. Montieth told him was not "very different" from what S.M. told him. He said, "The difference is - - let me think of what I'm trying to say here to make sure I say it right. Where [S.M.] said that her dad touched her privates, the wife told me that she didn't think he actually touched the vaginal area."

## II. Analysis

Defendant contends that the trial court erred by refusing to allow him to attempt to impeach S.M's credibility with testimony that S.M. told Ms. Green that Defendant's hand did not go below her waist when he touched her. The State concedes that the trial court erred but contends that this was harmless error.

At trial, S.M. testified that she told Leslie Montieth that Defendant put his hands down her pants. She also testified that the "adults" did not ask her if Defendant touched below her navel or all the way down her pants. S.M. denied that she had ever told Ms. Green or Ms. Montieth that the incident did not happen. Defendant then attempted to impeach S.M.'s credibility through Ms. Green. In a bench conference, defense counsel argued that Ms.

-9-

Green's testimony would show S.M.'s untruthfulness about the touching. The trial court refused to allow the testimony because the trial court concluded it was inadmissible hearsay. The court allowed defense counsel to ask about the victim's reputation for truthfulness, but not about specific acts. Although Defendant did not make an offer of proof at trial as to the excluded testimony, he attached affidavits from Ms. Green and Joseph Horn to his motion for new trial. According to the affidavits, Ms. Green would have testified that S.M. told her that Defendant did not touch her pubic area and that his hand "did not go down further than the button on the front of her pants[.]" Joseph Horn would have testified that he heard S.M. tell Ms. Green that Defendant did not "touch her in the pubic area." *See State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986)(If an inadequate offer of proof is made at trial, counsel may support the motion for new trial by "an affidavit or other report.")

> Tennessee Rule of Evidence 613(b) provides that:
>
> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party opponent as defined in Tennessee Rule of Evidence 803(1.2).

*See also State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 613(b) allows the introduction of otherwise inadmissible extrinsic evidence for impeachment purposes. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). Impeachment evidence, like any evidence, must be relevant. *State v. Leach*, 148 S.W.3d 42, 56 (Tenn. 2004). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Therefore, "[i]mpeachment by extrinsic evidence as contemplated by Rule 613 must relate to facts relevant to a material issue at trial." *Leach*, 148 S.W.3d at 56. Questions regarding the relevancy of evidence are entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). At the time of Defendant's trial, a prior inconsistent statement introduced for purposes of impeachment could be considered only on the issue of credibility and not as substantive evidence. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)(quoting *Jones v. Lenior City Car Works*, 216 Tenn. 351, 392 S.W.2d 671, 673 (Tenn. 1965); *Reece*, 637 S.W.2d at 861; *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1991). However, effective July 1, 2009, Tennessee Rule of Evidence 803 was amended to permit some prior inconsistent statements to be treated as substantive evidence. *See* Tenn.R.Evid. 803(26). In

any event, the trial court in this case erred by not allowing Ms. Green to testify about S.M.'s prior inconsistent statement.

We cannot conclude that the trial court's error did not affect the verdict to Defendant's detriment. An error will not be grounds for reversal unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The State contends that the trial court's error in excluding the evidence in this case was harmless because there was testimony that S.M. had a reputation for untruthfulness and because the victim admitted that she had committed theft on two occasions. However, the thefts occurred after the offense in this case. Although the trial court would not allow Ms. Green and Joseph Horn to testify that S.M. said Defendant did not touch her pubic area, the court allowed the State to call Investigator Mike Kennamore as a rebuttal witness after Ms. Montieth testified that S.M. was prone to lying and had a reputation for not telling the truth. The court allowed Investigator Kennamore to testify that Ms. Montieth never told him that S.M. was a liar. He also testified that what Ms. Montieth told him was not "very different" from what S.M. told him. He said that Ms. Montieth did not agree with what S.M. said and that she did not think Defendant actually touched S.M.'s vaginal area. In closing, the prosecutor focused on the credibility of Ms. Montieth and made the following statement:

> Then he wants to show that she doesn't tell the truth. So he puts up the defendant's girlfriend who knew her for about six months and he puts up the girl's stepmom who is not divorced from the defendant. Well, now, I asked her - - Excuse me. I asked the stepmom, well, now, this reputation, this big reputation for untruthfulness, where did it come from? Friends and family. Who? How many instances? Well, a bunch. She was real vague. She stumbled around with her answer and she really couldn't come up with much.

> Then I said, "Did you tell the investigator that she was untruthful, that she had this reputation for untruthfulness?" "Did I talk to him? Yes, I did talk to him." Well, now, that was a really plain answer. I gleaned a lot from that. I hope you got more than I did. I called the investigator back to check on that. "No, she never told me that [S.M.] had a reputation for being untruthful." Okay. Now, let's look at this. If your husband is under investigation for sexual battery by an authority figure, don't you think that would be a tidbit that the investigator might need? Oh, by the way, she's known to lie. Don't you think that would be helpful? I think that would be about one of the first ones I'd throw in. She didn't tell him that. Mr. Tatum says there's more than one way

to say she's not telling the truth. Did their stories correspond? And, basically, the investigator's answer was yeah, they were pretty much on.

The prosecutor also noted that S.M.'s testimony concerning the touching was undisputed at trial. The only proof of the touching came from S.M.'s testimony. At trial, S.M. testified that she told Ms. Montieth, not Ms. Green that Defendant put his hand below her belly button. She denied telling Ms. Green or Ms. Montieth that the incident did not happen and that Defendant, Ms. Green, or Ms. Montieth did not ask her if Defendant touched below her navel or all the way down her pants. She also testified that Joseph Horn was not in the room when she talked to Ms. Green.

In light of the attack on Ms. Montieth's credibility concerning the victim's reputation for untruthfulness, the evidence presented at trial, and the prosecutor's remarks in closing statements, we are not persuaded that testimony concerning the thefts that occurred after the touching and S.M.'s reputation for untruthfulness alone is sufficient to make "harmless" the trial court's error. Accordingly, the conviction for sexual battery by an authority figure is reversed, and the cause is remanded for a new trial.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed.

_____
THOMAS T. WOODALL, JUDGE

-12-