IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2009

## STATE OF TENNESSEE v. TERRENCE GARDNER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08616     James C. Beasley, Jr., Judge**

**No. W2008-01089-CCA-R3-CD  - Filed October 5, 2009**

The defendant, Terrence Gardner, was convicted of first degree (felony) murder, aggravated robbery, a Class B felony, and aggravated assault, a Class C felony. He was sentenced to life for the murder, to ten years for the Class B felony, and to four years for the Class C felony. The convictions for the murder and aggravated robbery were set to run concurrent to each other but consecutive to the aggravated assault, for a total effective sentence of life plus four years. On appeal, the defendant argues that the evidence was not sufficient to support his convictions and that the trial court erred in not permitting him to present a witness to be impeached. After careful review, we affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Gregory T. Carman and Charles Mitchell, Memphis, Tennessee, for the appellant, Terrence Gardner.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant and two others robbed a gas station where the defendant shot and killed the store clerk. The defendant also shot the former owner of the gas station in the hand when he arrived on the scene and looked through the window.

At trial, the victim's wife testified that her husband died on the evening of June 12, 2006, while working at the BP gas station at 3727 North Watkins in Memphis, Tennessee.

Robert Malone testified that he was with the defendant and Travis Ward on June 12, 2006, at the home of his cousin, Manuel Raynor, in the Frayser neighborhood of Memphis. He testified

that, at some point that day, the defendant showed Raynor a gun, which Malone believed to be a nine millimeter or a .380 handgun. That evening, he walked with the defendant and Ward to the BP gas station. He testified that he did not know the defendant brought his gun with him though the defendant had talked about robbing the Happy Wok, a nearby Chinese restaurant. He said he did not think the defendant was serious until the defendant asked Malone to be a lookout. To avoid any involvement in a robbery, Malone testified that he told the defendant the restaurant was closed.

Malone testified that the defendant took out the gun when they entered the gas station. At that time, he and Ward ran out of the store. Malone recalled that the clerk was the only person in the store and that he heard a gunshot as he ran across the street. He said that he turned and saw the defendant "kicking on the door" from inside the gas station. They ran to his cousin's house to get away from the defendant, but they did not phone the police. He testified that the defendant ran behind them after he "threw something up under a shed." He thought the "something" was the gun.

The defendant told them to go with him to his house. Malone testified that he went with the defendant because he was scared the defendant might kill him. On the walk to the defendant's house, the defendant told Malone that he killed the clerk at the gas station. When they arrived, they went to the defendant's bedroom where the defendant told him everything that he had done at the gas station, including how he killed the clerk and robbed the gas station. He said the defendant changed his clothes and shoes and counted the money that he stole from the station. They left the defendant's house and went to a Kroger grocery store where the defendant bought candy for Malone and Ward.

Malone testified that he did not tell anyone about the robbery and shooting because he was scared. He said, "I'm not a tough guy wannabe guy. I'm a really fraidy cat. I don't mean to say it like that, but I'm very terrified and petrified of people like him."

Malone spent the night at the defendant's house before returning to Raynor's house the next morning. Raynor told him that he had gone to the BP station to look for him and that the police probably wanted to talk to him. Raynor took him to a barber shop where his mother picked him up. His mother told him that the police wanted to talk to him.

He gave the police a statement on June 21, 2006, and stated that he knew the defendant committed the murder. He told police that he had been at the defendant's house the entire night and that the defendant left to commit the crimes. Malone stated that the defendant shot the clerk with a chrome and black .380 handgun because the clerk locked him in the store. He told police that the defendant kept his gun in a top drawer in his room.

Malone testified that his statement was not entirely accurate and that his mother got upset with him for lying. He gave another statement to police, acknowledging that he and Ward had accompanied the defendant to the BP station. He also said that he heard approximately three shots as he was running from the BP station. The defendant told him that a clerk from another store came up to the window of the gas station when he was trying to get out of the station. The defendant put the gun under a shed and retrieved it the next day. He did not know what the defendant did with the gun. He maintained that he did not know the defendant intended to rob the store.

-2-

Ward testified that he played basketball with Malone and Raynor on June 12, 2006, and then went to Raynor's house where they met with the defendant. He recalled that the defendant showed Raynor a gun which he thought was a .380. He acknowledged that he had previously testified that the gun came from under Raynor's car seat.

Later that evening, he walked with the defendant and Malone to the BP gas station to get something to eat. He said that the defendant pulled out a gun when they went inside. He testified that the defendant had told them that he "put the gun up" before they went to the BP station. He and Malone were able to run out of the store, but the defendant was locked inside. He recalled hearing a single gunshot as he left the store. The defendant ran after them when he left the station.

When the defendant caught up to them, Ward noticed blood on his shoes. The defendant told them that he killed the clerk because the clerk locked the door. They went to the defendant's house where the defendant counted the money he had taken from the gas station. The defendant gave him and Malone some money, and they walked to the store. He did not want to go home because he thought his mother would suspect him of committing the shooting.

Ward told his mother what had happened, and he gave the police a statement on June 21, 2006, identifying the defendant as the shooter. He said that he was recently indicted for especially aggravated robbery in an unrelated case stemming from a robbery at a laundromat near the BP gas station.

Raynor testified that he was in his car with the defendant, Malone, and Ward on June 12, 2006. He said he was interested in purchasing a gun, and the defendant showed him a .380 handgun. Raynor later went to work and told Malone that he would drive him home when he got off work. He returned home around midnight but Malone was not there. He drove around looking for Malone and went to the BP station where he told police he was looking for Malone. He saw the defendant the next morning, and the defendant told him that he had robbed the BP station and had killed the clerk. The defendant said that Malone was involved in the offense and that he only shot the clerk because he feared for his life. Raynor gave a statement to police on June 22, 2006, and identified the defendant from a photographic lineup.

The former owner of the gas station ("Victim Two") testified that the robbed BP gas station was located at 3727 North Watkins in Memphis. He testified that he managed the Citgo station across the street. On the night of the offense, June 12, 2006, he went to the BP station and a man wearing something on his face shot him in the hand through the window. He was unable to identify the defendant from the photographic lineup but believed the man was African-American.

After Victim Two was shot, he returned to the Citgo to phone police. When the police arrived, Victim Two returned to the BP. He saw that the bottom bars of the door had been removed and that the glass was shattered. Police were unable to get inside, because the door was locked. He testified that there is a switch near the counter that locks the door.

Officer Wesley Nelson of the Memphis Police Department testified that he responded to a call to the BP gas station on North Watkins in Shelby County just before midnight on June 12, 2006.

He said that Victim Two had been shot and was bleeding. Victim Two told the officer that the BP was being robbed and that the perpetrator was still inside the building. He and his partner proceeded to the BP and observed the victim lying in a pool of blood on the floor inside the station. They called for backup and forced their way through the locked doors. They determined that the victim was unresponsive and observed that the cash register was open, there were bloody footprints on the floor, and there were holes in the windows.

Officer David Galloway of the Memphis Police Department Crime Scene Unit responded to the BP station on June 13, 2006. He collected evidence, took photographs, and made a sketch of the scene. He said there were four spent .380 casings at the scene. The victim was lying on the floor close to the cash register.

Special Agent Shelly Betts of the Tennessee Bureau of Investigation Firearms Examination Unit tested three spent Remington .380 auto caliber cartridge cases, one fired Winchester brand .380 auto cartridge case, and two bullet fragments. Betts determined that all four cartridge cases had been fired from the same .380 auto caliber gun.

The defendant's mother testified that approximately one week before June 21, 2006, the defendant came home "sweaty" and out of breath at 9:30 or 10:00 p.m. The next morning, she went to his room and saw two young men that she did not know. The defendant identified them as Travis and Robert. She said that she told the boys to leave and that she never saw them again. She recalled that officers from the Memphis Police Department came to her home on June 21, 2006, looking for the defendant. She gave the officers consent to search the defendant's bedroom. They collected a pair of the defendant's shoes, some cell phones, and a notebook. She testified that the writing in the notebook did not look like the defendant's and that the shoes were not the defendant's because he wore a different size.

Kevin Lundy of the Memphis Police Department Homicide Unit testified that he was designated as the coordinator of the underlying case. He spoke to Malone and Ward and learned that the defendant was possibly involved in the shooting of the victim. He said that, initially, Malone was evasive about his involvement, especially in regards to being at the BP station. After Malone's mother became upset with him, he then told more of what happened.

Officer Lundy went to the defendant's home with a search warrant on June 22, 2006. He ordered the collection of a pair of red and white shoes that appeared to have blood on them located in the defendant's closet. He also ordered the collection of a notebook from the defendant's room that contained the handwritten note, "My whole life has changed why? [B]ecause I had to kill a man he and myself had never met."

Officer Demar Wells of the Memphis Police Department testified that he responded to the defendant's home on June 22, 2006, to collect evidence. He collected a pair of size ten-and-a-half shoes with blood on them and a notepad.

Special Agent Qadriyyah Debnam of the TBI Serology DNA Unit tested the shoes found in the defendant's bedroom and determined that the blood on the shoes matched the victim's DNA.

The Chief Medical Examiner for Shelby County performed the autopsy of the victim on June 13, 2006. She determined that the victim had gunshot wounds to his neck and his right arm. One bullet went through the victim's arm, and the evidence suggested that the gun was three feet or less from the victim at the time it was fired. The gunshot to the victim's neck tore the carotid artery and entered his cervical spine causing bruising and bleeding of the spinal cord. She opined that the victim died of the gunshot wound to his neck. She also said that a single bullet could have gone through the victim's arm and entered his neck.

Al Pritchard testified that he was housed with the defendant in prison. He said the defendant told him that he robbed a store in North Memphis and killed the clerk with an automatic handgun. The defendant told him he got $1600 from the robbery. He shot the clerk because the clerk reached for a gun. The defendant told him that he had blood all over his shoes and that the police found the shoes at his house but the shoes belonged to someone else.

The defendant testified that he played basketball with Raynor, Malone, and Ward on June 12, 2006. He claimed that Ward was wearing the red and white shoes found in his room. They went to Raynor's house after playing, got into Raynor's car, and smoked marijuana. He denied possessing a gun or showing one to Raynor, Malone, and Ward.

He testified that when Raynor went to work, he went back to his house with Ward and Malone so they could get more marijuana. He testified that they could not reach his "weed man" so Ward and Malone left to get more marijuana. He said that they were "sweating hard" and scared when they returned forty-five minutes to an hour later. He testified that Ward said he had robbed and shot "the dope man." He observed blood on Ward's shoes. Ward borrowed a pair of shoes from him and left the bloody pair at his house.

The defendant testified that they went to Kroger later and that Ward and Malone had a large sum of money with them. He said that they bought some marijuana and beer. He did not believe the story about robbing the "dope man" because they bought additional marijuana. He said that they eventually told him that they robbed the BP station and shot the clerk.

They slept at his house until his mother woke them up. He said Malone went home while he and Ward smoked marijuana with another person. He denied telling Raynor that he had robbed the BP or killed the clerk. He turned himself in on June 23, 2006, when he heard the police were looking for him. The defendant claimed that the size ten-and-one-half shoes belonged to Ward and that he had never worn them because he wears a size 12. He said the line, "I shot a man I didn't know," was one he heard on the radio. He maintained that he did not go to the BP and did not commit the underlying crimes.

The jury convicted the defendant as charged with one count of first degree (felony) murder, aggravated robbery, and aggravated assault. He was later sentenced to life for the murder, ten years for the robbery, and four years for the assault. The life sentence and ten-year sentence were to run concurrently, and the four-year sentence was to run consecutively to the other sentence, for a total effective sentence of life plus four years.

Analysis

On appeal, the defendant argues that the evidence was not sufficient to support his convictions for felony murder, aggravated robbery, and aggravated assault. Specifically, the defendant contends that the evidence was insufficient to convict him because no physical evidence was found at the crime scene, no money was found in the defendant's home, and he wore a different size shoe than the bloody ones found in his closet.

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. *Id.* This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the defendant demonstrates that the facts contained in the record and the inferences which may be drawn therefrom are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. *State v. Brewer*, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). Accordingly, it is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and an appellate court does not reweigh or reevaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

After viewing the evidence in the light most favorable to the State, the record reflects that a rational trier of fact could have found the essential elements of the offense of felony murder, aggravated robbery, and aggravated assault beyond a reasonable doubt. Felony murder is a killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery. T.C.A. § 39-13-202(a)(2) (2006). Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-13-401 (2006). Aggravated robbery is robbery (1) accomplished with a deadly weapon; or (2) where the victim suffers serious bodily injury. T.C.A. § 39-13-402(a) (2006). Aggravated assault occurs when a person intentionally or knowingly commits an assault as defined in Tennessee Code Annotated section 39-13-101 and causes serious bodily injury to another or uses or displays a deadly weapon. *See* T.C.A. § 39-13-102(a)(1). An assault occurs when a person intentionally, knowingly, or recklessly causes bodily injury to another. T.C.A. § 39-13-101(a)(1).

The evidence at trial established that the defendant went to the BP gas station to commit a robbery. To execute the robbery, he shot and killed the store clerk and wounded the former owner when he arrived at the store. Two individuals accompanied the defendant to the BP station on the night of the incident. When they arrived at the station, the defendant displayed a gun that the two men had seen earlier that day. The two men with the defendant fled the gas station and heard at least

one shot fired as they ran. They both testified that the defendant was locked inside the gas station following the robbery.

After the two men accompanying the defendant fled, the store's former owner went to the gas station. He saw an African-American man wearing a bandana on his face standing near the counter. Ward testified that the defendant was wearing a bandana on the night of the robbery. The defendant shot the owner through the window of the gas station. Malone testified that the defendant told him that, as he was shooting at the window to get out of the gas station, a clerk from another store approached the window.

The second victim called the police from another gas station. The first officer to the scene testified that the second victim had been shot in the arm and was bleeding. Victim Two was later taken to the hospital for treatment of his injuries. The police and the second victim testified that the cash register was open and empty. Four spent .380 casings were found at the crime scene.

The defendant later told Ward and Malone that he had robbed the gas station and shot the clerk because he had locked him in the station. The defendant changed clothes and put the bloody shoes into his closet. Police collected the shoes and determined that the blood on them belonged to the victim. Ward and Malone both testified that the defendant counted money while they were in his bedroom. The defendant told Raynor and a fellow prisoner that he had robbed the BP station and killed the clerk.

The record reflects that the evidence presented at trial was sufficient to show that the defendant went to the BP gas station to commit a robbery. During the course of the robbery, he brandished a gun and shot and killed the victim. During the commission of the offense, he shot the second victim in the arm, causing him bodily injury. The jury properly convicted the defendant of first degree (felony) murder, aggravated robbery, and aggravated assault.

Next, the defendant argues that the trial court erred by refusing to allow him to present the testimony of a private investigator to impeach statements made by Manuel Raynor. The State concedes that it was error for the trial court to deny the defendant the opportunity to use the testimony of the investigator but argues it was harmless error in light of the other evidence of the defendant's guilt.

Raynor testified at trial that he did not remember speaking to the private investigator. The defendant sought to introduce the testimony of the investigator to impeach several prior statements by Raynor.

Tennessee Rule of Evidence 613(b) provides for the introduction of otherwise inadmissible extrinsic evidence for impeachment. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b); *see also State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). A prior inconsistent statement introduced for purposes of impeachment may be considered only on the issue of credibility

and not as substantive evidence. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000) (quoting *Jones v. Lenoir City Car Works,* 392 S.W.2d 671, 673 (Tenn. 1965)). The trial court's assessment of whether a statement is inconsistent will only be overturned if the trial court abused its discretion. *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995).

Here, the defendant sought to introduce the testimony of a private investigator to impeach the testimony of one of the State's witnesses. Raynor testified at trial that he saw the defendant with a gun on the day of the offenses. He also testified that he did not see Malone on the day after the shooting. Finally, he said that he did not recall talking to the private investigator or specifically telling her that Malone was at his house on the morning after the offenses.

According to the defendant's offer of proof, the investigator would have testified that Raynor told her that he did not see the defendant with a gun on June 12, 2006. She stated that Raynor also told her that Malone told him that Malone and Ward had been with the defendant at the BP station. The trial court ruled the testimony was inadmissible because Raynor testified that he did not recall talking to the investigator.

When a witness is presented with a prior inconsistent statement, a "witness then has several possible responses: the witness can admit, deny, or not remember making all or part of the statements." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 6.13[5][a] (5th ed. 2005). A prior inconsistent statement can be offered to impeach when the witness does not admit or deny making the contradictory statement but merely testifies that he does not remember making the statement. *Dailey v. Bateman*, 937 S.W.2d 927, 930 (Tenn. Ct. App. 1996). However, extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally acknowledges having made the prior statement. *Martin*, 964 S.W.2d at 567. If the witness admits making the prior inconsistent statement, any extrinsic proof of the statement would be cumulative. *Id.* Extrinsic evidence may be used to impeach the credibility of a witness who denies or cannot remember having made a prior statement. *State v. Rice*, 184 S.W.3d 646, 682 (Tenn. 2006); *see also Martin*, 964 S.W.2d at 567 (providing that "extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement").

The trial court erroneously concluded that the testimony could not be introduced because the witness did not recall the statements. When a witness denies or does not recall a statement, extrinsic evidence of the statement may be introduced for impeachment purposes. *See Rice*, 184 S.W.3d at 682; *Martin*, 964 S.W.2d at 567.

However, in light of the evidence in the record, the error in not allowing the testimony is harmless. A violation of an evidentiary rule may not mandate reversal if the error was more probably than not harmless. *Martin*, 964 S.W.2d at 568 (quoting *United States v. Barrett*, 703 F.2d 1076, 1081-82 (9th Cir. 1983)).

The evidence presented here strongly supported the conclusion that the defendant went to the gas station to commit a robbery. During the course of the robbery, the defendant shot the clerk and killed him and also shot the second victim. As previously stated, Malone and Ward both

testified that they went to the gas station with the defendant and ran away when they saw he had a gun. They heard the defendant fire the gun inside the gas station. The defendant later told them that he robbed the gas station and killed the clerk because he locked him inside. Blood matching the victim's DNA was discovered on shoes in the defendant's closet. The impeachment testimony would not have affected the outcome of the case and is, therefore, harmless.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE